56 A.3d 170

**CR–RSC TOWER I, LLC, et al.**

v.

**RSC TOWER I, LLC et al.**

**No. 115, Sept. Term, 2011.**

Court of Appeals of Maryland.

Nov. 27, 2012.

---

388

Andrew J. Graham (Steven M. Klepper of Kramon & Graham, P.A., Baltimore, MD), on brief, for petitioners/cross-respondents.

Brian L. Schwalb (Mitchell Y. Mirviss and Samantha M. Williams of Venable LLP, Rockville, MD), on brief, for respondents/cross-petitioners.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA, and McDONALD, JJ.

ADKINS, J.

In this case, we determine the proper measure of lost profit damages in a breach of contract case, a question uncommon for our docket. We also review the rare situation when a trial court has permitted a litigant to discover and introduce into evidence communications between an opposing party and its attorneys, based on an implied waiver of the attorney-client privilege via testimony. Finally, we answer four other issues raised by the parties relating to this urban real estate development that failed to come to fruition.

The owners of two adjoining properties leased them to developer-tenants for the purpose of building an apartment building on each. As construction was beginning, the landlords breached the ground leases by refusing to provide estoppel certificates and contesting the tenants' building permits. The landlords' breach prevented the tenants from obtaining financing, which ended the development project. The tenants sued for lost profits.

In discovery, the landlords admitted to breaching but refused to explain why they had breached, stating simply that they had relied on the advice of counsel. Before trial, the Circuit Court for Montgomery County ruled against the landlords on several motions, holding that (1) the tenants could discover and introduce evidence of the landlords' reasons for breaching, including communications with their former counsel, (2) the landlords could not introduce evidence of the 2008 crash in the real estate market to show that the tenants would not have made profits, and (3) the landlords could not argue or present evidence that the tenants, having planned to create a shell company to operate the apartment buildings, were not the real party in interest. The jury awarded the tenants over $36 million in damages, holding the landlords jointly and severally liable. The trial court also awarded joint and several attorneys' fees.

The landlords appealed, contesting the issues mentioned above, as well as whether joint and several liability was proper. The Court of Special Appeals held that the landlords could not be held jointly and severally liable for damages but otherwise affirmed. Both parties petitioned for *certiorari*. For the reasons explained below, we shall affirm the judgment of the Court of Special Appeals.

## Facts and Legal Proceedings

On June 16, 2004, Respondents/Cross–Petitioners RSC Tower I, LLC and RSC Tower II, LLC ("Tenants") entered into separate ground leases to develop adjoining properties in Rock Spring Park in Montgomery County, Maryland. The owners of the properties, Camalier L.P. and Davis Brothers

Montgomery Farm L.P. ("Landlords"), signed the ground leases. The ground leases provided that Tenants—corporate entities formed by Penrose development company for the purpose of developing the two parcels—would build "high rise multifamily apartment project[s]" on each parcel as part of a common plan. Specifically, RSC Tower I, LLC agreed to build "Tower I" on Parcel 20, with construction to start no later than July 15, 2004. RSC Tower II, LLC agreed to build "Tower II" on Parcel 21, with construction to start no later than July 1, 2009.[1] Each tower was to contain approximately 350 units.

The plan for the two properties changed later in 2004, when Tenants and Landlords discussed building instead condominium units, a hotel, and a spa resort. The developer for this new project was to be Canyon Ranch, an outside development company. On March 3, 2005, Tenants obtained approval of the site plan amendment for the new project from the Maryland National Capital Park and Planning Commission ("Commission"). Additionally, because Maryland law prohibits developing residential condominiums on leasehold estates,[2] on September 13, 2005 Landlords agreed to sell the parcels to Tenants, modifying the ground leases accordingly and entering into sales contracts to convey the land. As a preliminary step to selling the properties, Landlords assigned their interests in the ground leases to Petitioners/Cross–Respondents CR–RSC Tower I, LLC, Second CR–RSC Tower I, LLC, CR–RSC Tower II, LLC, and Second CR–RSC Tower II, LLC, four corporate entities wholly owned by the owners of the properties.[3]

---

1. RSC Tower II, LLC could obtain an extension to July 1, 2010, upon certain conditions.

2. *See* Md.Code (1974, 2010 Repl.Vol.), § 11–102(a)(2)(i) of the Real Property Article ("[A] leasehold estate may not be subjected to a condominium regime if it is used for residential purposes[.]").

3. We shall use the term "Landlords" to refer to these corporate entities as well as the owners of the properties.

Yet on August 28, 2006, Tenants reverted to the original plan to build the apartment towers, filing another site plan amendment with the Commission. Tenants returned to the original plan because Canyon Ranch withdrew from the project, citing what it called "the overall slow down in the condominium marketplace" and "some missteps during the development project." A power struggle ensued, with Landlords asserting that they had the "sole authority" to determine whether to return to the apartment plan or to proceed with the condominium plan. Nevertheless, the Commission approved the site plan amendment. Landlords then instituted administrative actions contesting the Commission's approval of the site plan amendments as well as the decision of the Montgomery County Department of Permitting Services ("DPS") to issue a building permit for Tower I.

Tenants moved forward with the apartment project, entering into a Memorandum of Understanding ("MOU") with Northwestern Mutual Life Insurance Company ("NML") under which NML agreed to provide an $85 million construction loan and purchase $30.1 million in equity in the apartment towers. To finalize the financing agreement, in October 2006 Tenants requested that Landlords execute estoppel certificates, as called for by the ground leases. In simple terms, the estoppel certificates would certify that Tenants were in compliance with all terms of the lease. There was some back and forth about the terms of the estoppel certificates, and when Landlords still had not signed them by October 26, 2006, Tenants threatened to sue.

On November 3, 2006, Landlords wrote to Tenants, attaching draft estoppel certificates with several reservations. In those certificates, Landlords asserted that Tenants were in breach of the ground leases. When Tenants showed the certificates to NML, it said the certificates were not sufficient to finalize the financing agreement because Landlords said that Tenants were in breach. Tenants then filed a declaratory action against Landlords in the Circuit Court for Montgomery County.

While the lawsuit was pending, Tenants continued negotiating with NML, ultimately agreeing to a financing arrangement under which Tenants would assign their interest in Tower I to a separate corporate entity, Sorrento, which would be owned by NML and Tenants as "90/10 partners." [4] The plans further provided:

Cash flow will be split 90/10 [until] both parties earn a 10% cumulative preferred return. Thereafter, cash flow will be split 60% to [NML] and 40% to [Tenants].

These plans were reflected in Tenants' formal application for financing on December 8, 2006. In anticipation of the financing agreement, both NML and Tenants prepared *pro formas* projecting the towers' expected profits.

On April 4, 2007, the Circuit Court entered summary judgment in Tenants' favor, finding that Landlords had breached the ground leases by failing to provide the requested estoppel certificates and pursuing administrative actions against the site plan amendments and building permits. The Circuit Court ordered Landlords to execute the requested estoppel certificates within three days and dismiss the administrative actions.

Landlords appealed, and the Court of Special Appeals stayed the order to dismiss the administrative actions. Landlords signed the estoppel certificates but attached cover letters expressly reserving "all claims asserted in the pending litigation" and "all claims regarding the existence of any default, event, or condition that was not addressed by the Court in its Order, the final adjudication of which may [cause] any of the certifications contained in the Estoppel Certificates to be inaccurate." Of course, these reservations caused NML to reject the estoppel certificates, and the financing deal

---

4. There were actually two planned Sorrento entities, Sorrento Apartments Associates, LLC, which was to hold Tenants' leasehold interest for Tower I, and Sorrento Management Associates, LLC, which was to serve as the borrower of the NML loan and also be the sole member and manager of Sorrento Apartments Associates, LLC. Sorrento Apartments Associates, LLC, was also to be the guarantor of the loan.

remained stalled. The Court of Special Appeals ultimately affirmed the order to dismiss the administrative actions, which Landlords did on September 8, 2008. This appellate decision, though, is not what we review today. We review issues arising in a second suit brought by Tenants against Landlords.

In September 2008, when the Court of Special Appeals' decision came down, the previous financing arrangement with NML was no longer available, and the building permits had expired. Thus, instead of attempting to move forward with the project,[5] Tenants filed their second lawsuit on March 3, 2009, seeking damages from Landlords in the amount of $30 million.[6] An amended complaint filed on October 29, 2009, increased the demand to $50 million and alleged that Landlords had acted in bad faith and committed a "succession of breaches" following the initial refusal to sign the estoppel certificates.

In discovery, Tenants questioned Landlords about their reasons for refusing to sign the estoppel certificates and instituting the administrative actions. Landlords' responses almost uniformly pointed to conversations with counsel as the reason for their actions. Accordingly, Tenants filed a motion to compel discovery from Landlords' former counsel, Hogan & Hartson, which Landlords opposed. The trial court ruled in Tenants' favor, ordering discovery from Hogan & Hartson regarding Landlords' reasons for breaching. In discovery, Tenants obtained an email from Davis Camalier, one of Landlords, in which he instructed the lawyers: "Just make sure you stop the bastards Whichever way you choose to go. We need some leverage[.]" Some might say this was the "smoking gun."

---

**5.** Olav Kollevoll, co-owner and general counsel of Penrose, testified that Tenants could not move forward with the project until they created new plans and specifications to comply with changes to the building code that had occurred during the litigation.

**6.** This action was consolidated with the prior lawsuit on January 21, 2010.

On the first day of trial, the trial court ruled on several pre-trial motions. It reserved ruling on Landlords' motion to exclude evidence of "motivations that led to the breach of the Ground Leases, and ... communications with former counsel Hogan & Hartson," opting to wait "and see how that played out[,] ... if it was going to be used as a defense ... [, and not] mention it in opening statement." Significantly, the court granted Tenants' motion to exclude evidence or argument relating to "post-breach market conditions for the purpose of seeking to prove that [Tenants] have no damages or lesser damages than claimed." This had the effect of preventing Landlords from presenting evidence or pursuing cross-examination regarding the post-breach decline in the real estate market.[7]

The trial occurred between March 1 and March 11, 2010. On the first day of trial, Tenants filed a second amended complaint that alleged a breach of the covenant of good faith and fair dealing; raised the demand for damages; and added, as an alternative to the lost profits claim, $23 million in reliance damages. The second amended complaint also alleged that each Tenant was a third-party beneficiary of the other's ground lease, making Landlords jointly and severally liable for all damages.

Tenants presented the expert testimony of Wiley Wright, who used the *pro formas* prepared by NML and Tenants in advance of their financing agreement to estimate the amount of profits that the towers would have made. Expert William Foote also calculated the money spent by Tenants in reliance on the contracts. The "bastards" email was introduced into evidence as well.

The verdict was large. The jury awarded damages of $36,350,239 against Landlords, jointly and severally, and did not specify whether the damages were lost profits or reliance

---

**7.** Finally, the trial court struck Landlords' affirmative defense that Tenants had failed to state the correct party in interest, precluding any testimony or reference to such defense at trial.

damages. The trial court also awarded joint and several attorneys' fees in the amount of $3,654,633 against Landlords.

The dispute then took its second trip to Annapolis, with Landlords' appeal. The Court of Special Appeals issued a published opinion reversing the joint and several nature of the damages award but otherwise affirming. *See CR–RSC Tower I, LLC v. RSC Tower I, LLC,* 202 Md.App. 307, 32 A.3d 456 (2011).

### Questions Presented

Landlords petitioned for *certiorari,* asking:

1. Under what circumstances should a Court permit (or require) evidence of post-breach market conditions affecting a claim for lost profits?

2. Where a plaintiff seeks reliance damages as an alternative to proving lost profits, is a defendant entitled to present evidence that the plaintiff would never have recouped its investment in a business venture?

3. Does a defendant, in denying a plaintiff's charge of bad faith, waive the attorney-client privilege as to communications relevant to the subject-matter of the claim of bad faith?

4. Where two defendants are not jointly and severally liable on separate contracts, may a court award the related attorneys' fees on a joint and several basis?

5. Under what circumstances can a plaintiff recover lost profits that, had a transaction proceeded as planned, would have belonged to a non-party entity?

Tenants filed a cross-petition for *certiorari,* asking:

May [Landlords] be found jointly and severally liable for their joint effort to derail an integrated real estate development project on adjoining parcels of land, where they breached identical covenants in two related ground leases, and the jury found that each [Landlord] breached covenants running with the land to implement a uniform plan of development for each [Landlord's] benefit?

We granted *certiorari* on February 8, 2012, *CR–RSC Tower v. RSC Tower,* 424 Md. 628, 37 A.3d 317 (2012) as to all

questions, and shall affirm the judgment of the Court of Special Appeals.

## Discussion

### Post–Breach Market Evidence

Landlords sought to show that Tenants would have made no profits, regardless of whether there was a breach. They offered expert testimony about the real estate market crisis in 2008–2010, when, as phrased by counsel, "the world has changed"[8] and, "the cataclysmic events of 2008 in the economy"[9] took place. In granting Tenants' Motion in Limine, the trial court ruled that Landlords could not present evidence of "post-breach market conditions," such as the unusually severe drop in the real estate market in 2008, and the market's static nature in 2010 at the time of trial. The Order stated that designated defense experts were not permitted to opine that "Key Assumptions" made by Tenants' expert Wright, who testified about pro forma projections made in 2006, were "unreasonable under current market conditions." The Court of Special Appeals affirmed, citing the "general principle" that contract damages are measured at the time of breach. *CR–RSC*, 202 Md.App. at 344, 32 A.3d at 478. The court held that this rule applied to both collateral and direct lost profits. *Id.*[10]

Landlords argue that this ruling was in error, because evidence of the post-breach market is a necessary part of any lost profits claim. Without such evidence, they say, a plaintiff cannot meet the requirement that lost profits be proved with "reasonable certainty."[11] They assert that their proffered

---

8. Tenants' counsel.

9. Landlords' counsel.

10. *See M & R Contractors & Builders, Inc. v. Michael*, 215 Md. 340, 346, 138 A.2d 350, 353–54 (1958) (distinguishing between collateral and direct lost profits).

11. *See David Sloane, Inc. v. Stanley G. House & Assocs., Inc.*, 311 Md. 36, 42, 532 A.2d 694, 697 (1987) (explaining that plaintiffs have the burden of proving "lost profits with reasonable certainty").

evidence of post-breach market conditions would have showed that the towers never would have made a profit. Thus, Landlords contend not only that the trial court erred by excluding such evidence, but also that Tenants' lost profits claim fails as a matter of law for lack of post-breach evidence.[12] Tenants respond generally that evidence of post-breach market·conditions not contemplated by the parties is irrelevant and inadmissible to prove lost profits, and that reasonable projections made during the contract are sufficient to sustain the verdict.

 The decision whether to allow or preclude the admission of evidence is generally committed to the sound discretion of the trial court. *Ruffin Hotel Corp. of Md., Inc. v. Gasper*, 418 Md. 594, 619–20, 17 A.3d 676, 690–91 (2011). We will only find an abuse of such discretion "where no reasonable person would share the view taken by the trial judge." *Consol. Waste Indus. v. Standard Equip. Co.*, 421 Md. 210, 219, 26 A.3d 352 (2011) (quoting *Brown v. Daniel Realty Co.*, 409 Md. 565, 601, 976 A.2d 300, 321 (2009) (quotation marks omitted)). We review for clear error "the trial judge's factual finding that an item of evidence does or does not have 'probative value,'" but we review de novo "the trial judge's conclusion of law that the evidence at issue is or is not 'of consequence to the determination of the action.'" *Gasper*, 418 Md. at 620, 17 A.3d at 691 (citation omitted). Thus, we examine the law of contracts and how to prove damages from a breach in order to determine whether the trial court erred in excluding Landlords' proffered evidence about the post-crash real estate market.

---

12. Yet Landlords' petition for *certiorari* did not raise the alternative argument that, assuming the post-crash market evidence was unnecessary and inadmissible, the evidence actually presented was insufficient to raise a jury issue. That question was argued and decided in the Court of Special Appeals, which held that the evidence presented was sufficient, affirming the denial of Landlords' motion for judgment. *CR–RSC*, 202 Md.App. at 345–47, 32 A.3d at 478–79. Because Landlords did not raise that question in their petition for *certiorari*, we shall not address it. *See* Md. Rule 8–131(b)(1).

We observe at the outset that the parties' phrasing of the lost profits issue is imprecise. Both parties offered evidence of "post-breach market conditions," in the sense that each sought to introduce evidence relating to 2009 and 2010. The difference is that Tenants' market evidence as to 2009 and 2010 consisted of projections made during the pre-breach life of the contract, by them and NML while negotiating the financing agreement, and Landlords' market evidence consisted of analyses made for trial based *only* on conditions current at trial. Landlords argue that post-breach market evidence is necessary to prove lost profits. Yet the 2010 market evidence they proffered, as the attorneys agreed, reflected a "cataclysmic change" from what was contemplated in 2006. This distinction, as we shall explain, is key to determining whether Landlords' market evidence was relevant to, or necessary for, proving Tenants' lost profits claim.

### General v. Consequential Damages

■ As we said in *David Sloane, Inc. v. Stanley G. House & Assocs., Inc.,* a party injured by a breach of contract has a right to damages based on his expectation interest as measured by

 (a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus

 (b) any other loss, including incidental or consequential loss, caused by the breach, less

 (c) any cost or other loss that he has avoided by not having to perform.

311 Md. 36, 42, 532 A.2d 694, 697 (citing Restatement (Second) of Contracts § 347 (1981)).

■ Damages are calculated differently depending on which category the claim is in—whether it is for the "value of the other party's performance" or a "consequential loss" following from the breach. As we recently said in *Burson v. Simard,* when the claim is based on value, it is a "general damages" claim, calculated as "the difference between the contract price and the fair market value at the time of breach." 424 Md.

318, 327–28, 35 A.3d 1154, 1159 (2012) (citation and quotation marks omitted). However, when the claim is for "consequential loss," it is a "special" or "consequential" damages claim, calculated as losses that "may reasonably be supposed to have been in the contemplation of both parties at the time of making of the contract." *Id.* at 327, 35 A.3d at 1159 (citation and quotation marks omitted).

There is some uncertainty over which category applies to lost profits claims. As Professor Dobbs explains, this is because the word "profit" can refer either to business profits or the increase in value of an item. *See* 3 Dan B. Dobbs, *Law of Remedies* § 12.4(3) (2d ed.1993). In the former instance, when lost profits are claimed for lost income from business operations that would have been made but for the breach, the claim is for "consequential" or "special" damages. *Id.; see also E. River S.S. Corp. v. Transamerica Delaval,* 476 U.S. 858, 874, 106 S.Ct. 2295, 2303–04, 90 L.Ed.2d 865 (1986) (lost profits claim for income that could have been earned but for a breach of warranty by a manufacturer who installed defective turbines on plaintiffs' ships was for consequential damages).

In the latter instance when the lost profits claim is based on the value of the item promised, the claim is for "general damages," as the damages are "the difference between the contract price and the fair market value at the time of breach." *Burson,* 424 Md. at 327–28, 35 A.3d at 1159 (citation and quotation marks omitted); *see also* Dobbs, *supra,* § 12.2(3) (lost profits are general damages when they are for "the market value of the very thing promised"); 11 *Corbin on Contracts* § 56.19 (Rev.ed.2005) (lost profits based on the resale of a promised car can be proved by looking to "the excess of this market price over the contract price").

In such cases, as with all general damages claims, the market value of the item is determined at the time of breach. The cases cited by Tenants support this rule. *See, e.g., Charles County Broad. Co., Inc. v. Meares,* 270 Md. 321, 332, 311 A.2d 27, 34 (1973) ("[I]n breach of a contract to sell, damages are based on value at the time the transfer was to be

made...."); *Kasten Constr. Co. v. Jolles,* 262 Md. 527, 531, 278 A.2d 48, 51 (1971) ("In general, the measure of damages when a vendee breaches a contract to purchase real estate is the difference between the contract price and the fair market value at the time of breach."); Dobbs, *supra,* § 12.2(3) ("General damages ... [i]n a contract for the sale and purchase of property or goods ... is the difference between contract price and market price on the date when performance was due.").

Landlords challenge Tenants' "time of breach" theory, pointing out that many of the cases cited by Tenants did not involve lost profits at all. *See, e.g., Beard v. S/E Joint Venture,* 321 Md. 126, 147–48, 581 A.2d 1275, 1285–86 (1990); *Charles County Broad. Co.,* 270 Md. at 332–33, 311 A.2d at 34; *Kasten Constr. Co.,* 262 Md. at 531, 278 A.2d at 51; *Marshall v. Haney,* 9 Gill 251, 260 (Md.1851); *Cannell v. M'Clean,* 6 H. & J. 297, 301–02 (Md.1825). Thus, Landlords argue, these cases do not support Tenants' position that the "time of breach" rule applies to consequential lost profits.[13]

---

**13.** Some of the cases cited by Tenants involving lost profits were of the "general damages" sort, as the lost profits claimed were based on the value of the thing promised, not anticipated business income. For example, one of Tenants' principal cases, *Rhue v. Dawson,* applied the "time of breach" rule to determine the "value of partnership property." 173 Ariz. 220, 841 P.2d 215, 225 (Ct.App.1992). As the court explained, the plaintiff had "calculated his lost profits as the difference between the appraisal value for the combined SCEA properties as if redeveloped ... and the cost of redevelopment." *Id.* at 223 n. 11. The same is true of Tenants' other cases. *See Gen. Universal Sys. v. Lee,* 379 F.3d 131, 154 (5th Cir.2004) (applying the "time of breach" rule to determine the value of "bargained-for goods" under Texas law); *J. D. Hedin Constr. Co. v. F. S. Bowen Electric Co.,* 273 F.2d 511, 513 (D.C.Cir.1959) (applying the "time of breach" rule to determine the value of the promised construction rights, calculated as the "contract price less the costs which plaintiff would have incurred"); *Bergman v. Parker,* 216 A.2d 581, 583–84 (D.C.1966) (applying the "time of breach" rule to determine the "value of the contract"); *James H. Rice Co. v. Penn Plate Glass Co.,* 88 Ill.App. 407, 414 (Ill.App.Ct.1900) (applying the "time of breach" rule where "the profit would have been the difference between the cost of manufacture and delivery and the contract price"); *Hawk v. Pine Lumber Co.,* 149 N.C. 10, 62 S.E. 752 (N.C.1908) (applying the "time of breach" rule to determine the "present value of the contract at the time of the breach").

Tenants would have us apply this "time of breach" rule across the board, to every kind of damages claim. Yet as Corbin explains, there cannot be one rule for every kind of breach, because different kinds of damages require different kinds of calculations. *See Corbin, supra,* § 55.11 ("There are many rules of damages for particular kinds of contracts, such as contracts for the sale of goods, construction contracts, employment contracts, etc." (footnotes omitted)); *see also Great Atlantic & Pacific Tea Co. v. Atchison, T. & S. F. R. Co.,* 333 F.2d 705, 708 (7th Cir.1964) ("Since the market value rule is merely a method, it is not applied in cases where it is demonstrated that another rule will better compute actual damages.").[14] Thus, we cannot take for granted that the "time of breach" rule applies here.

### *Applying The Time of Breach Rule*

■ Some of the cases cited by Tenants make this distinction very clear, explaining that the "time of breach" rule applies only to lost profits as general damages. *See, e.g., Anchor Sav. Bank, FSB v. United States,* 597 F.3d 1356, 1369 (Fed.Cir.2010) ("[T]he rule favoring the measurement of damages as of the time of the breach 'does not apply ... to anticipated profits or to other expectancy damages that, absent the breach, would have accrued on an ongoing basis over the course of the contract.'" (citation omitted)); *Sharma v. Skaarup Ship Mgmt. Corp.,* 916 F.2d 820, 825–26 (2d Cir.1990) ("It is ... fundamental that, where the breach involves the deprivation of an item with a determinable market value, the market value at the time of the breach is the measure of damages.... However, [when the things promised] did not have a market value and were not replaceable[, l]ost profits were therefore the best measure of the loss." (citations omitted)); *see also Lehrman v. Gulf Oil Corp.,* 500 F.2d 659, 668 (5th Cir.1974).

---

14. To the extent there is a "general standard," Corbin says, it is simply to award a plaintiff the "gains prevented and losses sustained" by the breach. 11 *Corbin on Contracts* § 55.11 (Rev. ed.2005).

The distinction between general damages and consequential damages is present in the secondary literature as well. *See* Dobbs, *supra*, § 12.4(4) (explaining that the time of breach rule applies to general damages but not special or consequential damages); *Corbin*, *supra*, § 60.12 ("[G]eneral damages are the full contract price minus the market value of the land at date of breach and also minus any payment received. Costs of making a resale may be allowed as consequential or incidental damages. If foreseeable, other consequential damages are available." (citing *Kasten*, 262 Md. at 530–31, 278 A.2d at 51)); *id.* § 60.11 (measuring damages "by the value of land at the time it should have been paid," whereas "consequential damages" are separate and extra). We think it clear, therefore, that the "time of breach" rule cannot be blithely applied to lost profits cases involving a business's anticipated income. The nature of the evidence offered to prove lost profits must be examined carefully.

Here, the evidence of damages reveals that although Tenants' expert, Mr. Wright spoke about "lost profits," he also sought to establish how to value the ground lease that Landlords' refused to perform. *See* Dobbs, § 12.4(3) at 76. ("Lost profits are normally consequential damages. But in some instances lost profits may resemble general damages because they furnish evidence about the value of the defendant's performance."). Indeed, Mr. Wright testified about market value of the ground lease, and lost profits in one unified approach. He explained,

> In the real estate industry for an income-producing piece of property, the market determines what will be paid for that income-generated piece of property by what's known as a 'capitalization approach.' And what that capitalization approach does, is it takes the net operating income for the piece of property when it's stabilized ... divides it by what's known as capitalization rate, and that's a market determined rate, and it's the commonly-used methodology for determining market value for an income-producing piece of property.

Using pro forma projections made in 2006 by Tenants and their lender and applying the capitalization formula, he estimated income from rentals for both towers, and subtracted total costs to build the towers, as well as ground rents payable to Landlords. He then discounted that figure to present value by using a 6–percent capitalization rate for Tower I and a 6.5–percent capitalization rate for Tower II to arrive at a total lost revenue for each tower. With Wright's damages testimony, lost profits for a 10–year period might be seen as congruent with the value (to Tenants) of the ground lease that Landlords breached.

Dobbs explains in § 12.4(3) general damages with this example:

> [Suppose] the defendant breaches a contract to sell land or a business to the plaintiff. A parcel of land or a business which can produce $100,000 in annual profits will have a greater market value than a parcel or a business which can produce only $10,000 in annual profits. So the plaintiff might attempt to prove the value of the land or the business by proving the profits it could earn. Coupled with evidence about the ratio between value and profits for the particular kind of enterprise, it would be possible to back-construct the value of the defendant's promised performance. Once value is determined the ordinary contract-market value measure could be used to figure general damages. The damages are general damages in such a case because they are based on the value of the very performance promised by the defendant (land or business) and not on some secondary good derived from that performance.

*Id.* Dobbs uses the following example of consequential damages as a contrast with general damages:

> [Suppose] the defendant breaches a contract to supply paint to a painting contractor. The contractor cannot find substitute paint quickly and he suffers two losses: (a) he loses a contract job on which he would have made profits; and (b) his reputation suffers so that he loses future profits on customers he would have enlisted but for his reputation as a

painter who falls behind schedule. Although the second kind of claim may be identified as a loss of good will, both kinds of claims are for lost profits and both represent consequential damages[.] The damages are consequential because they are not based on the market value of the very thing promised (the paint).

*Id.*

▇▇ In one sense the damages proof in this case is more like the first example above. Yet, arguably these damages are unlike breach of sale of land or business in that example because Tenants were required to take necessary steps to develop the property in order to realize the profits Mr. Wright estimated. This was a complex undertaking requiring Tenants' expertise as developers. For this reason, it is difficult to say that the testimony reflected that the ground lease itself was equal in value to the 10–year income stream. We conclude, therefore, that the damages proved by Tenants should not be strictly categorized either as general or consequential. Accordingly, rather than stop our analysis with the conclusion that these are general damages, measurable only at breach, we will address further arguments made by Landlords, which are premised on their theory that these are consequential damages, measurable at a later day.

### Post–Breach Evidence

Landlords continue to vigorously argue that the trial court erred in refusing admission of their expert's testimony about the condition of the real estate market in 2010. They cite cases purportedly demonstrating that Maryland courts have always looked to post-breach market evidence to determine whether a lost profits claim has been proved with "reasonable certainty." Yet a close examination of those cases shows that they do not stand for Landlords' asserted rule. For example, in *Lanahan v. Heaver*, we commented that the plaintiff's unbuilt houses seemed not to be in demand given that "thirteen of those actually built remain unsold[.]" 79 Md. 413, 422–23, 29 A. 1036, 1038–39 (1894). Yet this was not why we held that the plaintiff's lost profits claim failed for lack of certainty.

As we explained, the lost profits claim failed because there was simply "no evidence in the record of what the market value of such houses would have been." *Id.* at 420, 29 A. at 1038.[15] Here, of course, we have the opposite problem: the parties proffered competing measures of the relevant market, and we must decide which is the proper measure.

Landlords' other cases are similarly unhelpful. For example, in *Macke Co. v. Pizza of Gaithersburg, Inc.*, we remanded to the trial court to calculate lost profits, speculating that if the plaintiff had found a substitute for the defendant's promised machines, then "a more appropriate measure of damages might be that grounded on the [plaintiff's] actual experience for the period [contemplated by the contract], rather than one based on extrapolating profits from the results experienced [previously]." 259 Md. 479, 492, 270 A.2d 645, 652 (1970). Landlords assert that this language directs courts to look to post-breach market evidence to determine the amount of profits a plaintiff would have made. Yet as Tenants point out, *Macke* did not involve "market evidence" at all, but instead referred to the plaintiff's "actual experience" with substitute performance during the period when the profits would have been made. *Id.*[16] We agree with Tenants that the best reading of *Macke* is simply that a plaintiff's actual experience with substitute performance is relevant to determining lost

---

**15.** We reiterated this point in *Lanahan*, saying: "Whether the five which were never built would have been sold had they been erected, within what time they would have been sold, and what prices they would have brought if sold, are questions to which **nothing in the record furnishes an answer.**" *Lanahan v. Heaver*, 79 Md. 413, 422, 29 A. 1036, 1039 (1894) (emphasis added).

**16.** This distinction is present in Dunn's treatise as well, which, in discussing "admissible evidence" on a lost profits claim, distinguishes between actual performance ("plaintiff's prior experience," "plaintiff's subsequent experience," "plaintiff's experience at other locations," "comparable experience of others," and "defendant's subsequent experience") and market evidence ("industry averages"). *See* 1 Robert L. Dunn, *Recovery of Damages for Lost Profits* §§ 5.7–5.17 (6th ed.2005). As Dunn explains, evidence of actual, comparable experience is generally admissible, but courts have split on whether "industry averages" are admissible. *Id.* § 5.16–17.

profits. Of course, Tenants could not seek substitute perform-ance here, as no one other than Landlords could produce the estoppel certificates respecting the ground leases.[17]

Moreover, in *M & R Contractors & Builders, Inc. v. Michael,* we were not even calculating the amount of lost profits when we mentioned substitute performance. Rather, we were discussing whether the plaintiff builder's substitute perform-ance would count as mitigation against his lost profits. We held that it would not unless the plaintiff's contract with the defendant "was such as to require [his] entire time and attention so that their breach made it possible for the builder to undertake another project[.]" 215 Md. 340, 356, 138 A.2d 350, 359 (1958). This was the context in which we said, "the actual gain made under the substituted contract must be considered in measuring the damages to which the builder is entitled." *Id.* We were not even discussing the measure of lost profits, let alone "post-breach market conditions." Final-ly, *Republic Ins. Co. v. Prince George's County,* the last case

---

**17.** Landlords' other principal cases also involved substitute perform-ance, as opposed to post-breach market evidence. In *Sloane,* the defendant breached an exclusive contract by replacing the plaintiff, an advertising agency, with another agency. 311 Md. at 41, 532 A.2d at 696. We held that, to calculate the lost profits the plaintiff would have made if it had gotten to work with the defendant, it was proper to look to the replacement agency's "experience to prove the volume of adver-tising activity actually done for [the defendant] during the relevant period. To that known output of work [is] applied the charges agreed to in its contract with [the plaintiff]." *Id.* Again, we did not mention any evidence of "market conditions," but instead looked to actual substituted performance as a means for calculating the profits the plaintiffs would have made. *See also Sinclair Refining Co. v. Jenkins Petroleum Process Co.,* 289 U.S. 689, 691, 700, 53 S.Ct. 736, 736, 740, 77 L.Ed. 1449 (1933) (granting discovery as to the defendant's post-breach use of the plaintiff's patent for the purpose of proving lost profits); *Fowler v. Printers II, Inc.,* 89 Md.App. 448, 476–77, 598 A.2d 794, 807–08 (1991) (affirming the trial court's calculation of lost profits based on the profits actually made by the company that had wrongly obtained the business promised to the plaintiff).

Professor Corbin actually uses *Sloane* as an example, saying that future business profits can be proved by looking to "proof of the sales made and business done in the agreed territory before the breach or of the sales made there by the principal or by his agent after the breach[.]" *Corbin, supra,* § 56.22.

cited by Landlords, did not involve lost profits, and its statement about measuring damages "as of the date of the breach" referred to "fluctuations in value," not market conditions. 92 Md.App. 528, 533, 608 A.2d 1301, 1304 (1992) (citation omitted).

 Thus, none of Landlords' Maryland cases directly support admitting post-breach market evidence to prove lost profits.[18] Indeed, we know of no Maryland cases in which such evidence was admitted for that purpose,[19] and out-of-

_____

**18.** The same is true of the Restatement provision cited by Landlords. *See* Restatement (Second) of Contracts § 352 (1981). Landlords point out that Illustration 6 in this provision involves a plaintiff who is permitted to prove lost profits with "records of the [business's] subsequent operation and of the operation of similar [businesses] in the same locality, along with other evidence including market surveys and expert testimony[.]" *Id.* Yet the Restatement does not specify whether such "market surveys" were conducted pre- or post-breach—except that this illustration is based on our decision in *Evergreen Amusement Corp. v. Milstead*, 206 Md. 610, 617–18, 112 A.2d 901, 904 (1955), in which the "market survey" was conducted prior to the time of contracting. Corbin mentions this Restatement provision as well. *See Corbin, supra*, § 56.17.

**19.** Perhaps the best case for Landlords is *Hoang v. Hewitt Ave. Assocs., LLC*, in which the trial court commented, post-breach, on the real estate market as part of his conclusion that lost profits had been proved with reasonable certainty:

The [trial] court factored in that the real estate market was "well-established" and that the evidence presented by [the plaintiff] assumed a flat market, not one that would increase. The court found that the real estate market "will almost certainly continue to appreciate at some rate." It noted, in addition, that town houses, being on the lower end of the housing market, enjoy greater protection from downward fluctuations in the real estate market than do other, more expensive, houses.

177 Md.App. 562, 573, 936 A.2d 915, 922 (2007).

Yet, despite this observation, it is not clear that any post-breach market evidence was presented. First of all, the plaintiff's complaint was filed just two months after the contract had been entered into. *Id.* at 568–69, 936 A.2d at 919. It is perhaps unlikely, then, that the parties produced new market analyses just two months after preparing to contract, solely for litigation purposes. Indeed, as the trial court explained, the plaintiff's evidence consisted of "assumptions . . . as to what is the real estate market likely to do a year from now, two years from now, even further out," which appears to refer to the plaintiffs' pre-contract projections, used as a basis of the agreement. *Id.* at 574,

state cases provide no general rule either.[20] Thus, we find no support for Landlords' claim that any and all post-breach evidence is admissible as a necessary part of any consequential lost profits claim. In our view, the question of time is not key. Rather, as we shall explain, the core question for consequential damages is whether they were in the contemplation of the parties when they contracted.

### The Contemplation of the Parties

As Professor Corbin explains, consequential lost profits "may be regarded as too remote or too speculative ... [but] will not be so regarded if the defendant had reason to foresee them." *Corbin, supra,* § 56.19 (footnotes omitted). Professor Dobbs agrees that foreseeability is the key, because, under *Hadley v. Baxendale,* 9 Ex. 341, 156 Eng. Rep. 145, 151 (1854), the "contemplation of the parties" at the "time of contracting governs" consequential damages. As he says:

> Both the moral and economic rationales for *Hadley v. Baxendale* suggest that the relevant time for determining

---

936 A.2d at 922. To be sure, it is possible that the evidence of "the real estate market as it existed at the relevant time" consisted of post–breach market analyses. *Id.* at 610, 936 A.2d at 944. But the Court of Special Appeals' characterization of the evidence as what "the parties expected," *id.,* coupled with the trial court's characterization of it as future "assumptions" and the quick turn-around from contract to trial, militates against such a conclusion. More likely is that the evidence of market conditions, just like Tenants' expert evidence here, was based on projections made pursuant to the parties' agreement. In any case, as with Landlords' other cases, *Hoang* does not provide direct support for the proposition that post-breach market evidence is relevant or admissible to prove lost profits.

**20.** *See, e.g.,* Dunn, *supra,* § 5.16 ("Another possible approach to proving lost profits damages is to use industry averages. The courts are divided, however, on the question whether this evidence is permissible." (citing numerous cases for each position)). *But see Advent Sys. Ltd. v. Unisys Corp.,* 925 F.2d 670, 681 (3d Cir.1991) (opining, before remanding for a new trial, that the "actual results in the marketplace during the pertinent two years" of business operation could be relevant to a lost profits claim for those two years); *Coonis v. Rogers,* 429 S.W.2d 709, 714 (Mo.1968) (holding that lost profits for a new business venture "may be recovered only when they are made reasonably certain by proof of actual facts, with present data for a rational estimate of their amount").

the "contemplation of the parties" is the time of contracting, not, for example, the time of breach. If the point is to let the parties prescribe their own liabilities, the time of contracting must control, and that is in fact the rule.

*Dobbs, supra,* § 12.4(7) (citing *Hadley,* 156 Eng. Rep. at 151 (consequential damages are "such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract")).

 Likewise, Professor Sutherland explains that consequential damages are determined by looking to what the parties can be said to have planned and assumed when they contracted. As he says, consequential damages are "such as ordinarily arise according to the **intrinsic nature of the contract** and the surrounding facts and circumstances **made known to the parties at the making of it.**" J.G. Sutherland, *A Treatise on the Law of Damages* § 51 (John R. Berryman, ed., 4th ed.1916) (emphasis added). These passages instruct us that consequential lost profits are calculated with reference to what the parties can reasonably be said to have anticipated when they entered into the contract. Thus, circumstances that cannot be said to have been "known to the parties" when they contracted—such as a post-breach boom or bust in the market—should not affect the measure of consequential damages that would "ordinarily arise" according to the "intrinsic nature of the contract." [21]

---

**21.** Other sections of Sutherland's treatise also support this interpretation. For example, when consequential damages are based on "special circumstances" known to both parties at the time of contracting, they are measured based on what **would ordinarily occur** under the contract as contemplated:

[I]n accordance with the doctrine of [*Hadley v. Baxendale,*] it is sufficient if the special circumstances under which the contract was actually made were communicated to the party sought to be charged, and the damages resulting from the breach are such as both parties **would reasonably contemplate would be the amount** of the injury which **would ordinarily follow from a breach** under those circumstances. (Emphasis added).

J.G. Sutherland, *A Treatise on the Law of Damages* § 52 (John R. Berryman, ed., 4th ed.1916); *see also id.* § 45 (consequential damages are "such as the law supposes the parties to [the contract] **would have**

To be sure, the *Hadley* foreseeability rule originated as a limit on damages and has been most often applied that way. But courts have also applied the rule positively, using it to justify damages because they were foreseeable or would ordinarily occur under the circumstances. *See Dobbs,* § 12.4(1) ("[T]here is no reason to deny consequential damages if the limiting rules are met."); *Anchor Sav. Bank,* 597 F.3d at 1369–70 (evidence of future lost profits that could have been derived from the lost income-producing asset *admissible);* *Midland Hotel Corp. v. Reuben H. Donnelley Corp.,* 118 Ill.2d 306, 113 Ill.Dec. 252, 515 N.E.2d 61, 67–68 (1987); *Welch v. U.S. Bancorp Realty & Mortgage Trust,* 286 Or. 673, 596 P.2d 947, 963 (1979); *AM/PM Franchise Ass'n v. Atlantic Richfield Co.,* 526 Pa. 110, 584 A.2d 915, 921 (1990) (treating "reason to know" test as equivalent to "foreseeable.").[22]

The dispositive questions, therefore, are (1) whether, at the time they entered into contract, it was foreseeable to the parties that a breach of contract might result in the termination of the real estate development project for which the land was being leased and, if so, (2) whether the trial court abused its discretion in ruling that post-breach market data was irrelevant in determining the expected value of performance as of the time of breach. Thus, evidence of post-breach booms and busts is not relevant—and thus not admissible—when it cannot be said that the parties foresaw it.

---

**apprehended** as following from its violation if **at the time they made it** they had bestowed proper attention upon the subject and had full knowledge of all the facts."); § 50 ("[T]he intention of the parties is to be ascertained from the whole contract, considered in connection with the surrounding circumstances **known to them.");** § 51 ("[I]f the contract of purchase is made with a view to . . . any known special use the damages which are contemplated to result from the vendor's breach are those which **would naturally follow** on the basis of the . . . special use, known to the vendor **when the contract was made.);** § 78 ("[T]o ascertain [lost] profits the nature and the special purpose of the contract, a subcontract, or other subsidiary and dependent arrangement, **within the contemplation of the parties at the time of contracting,** may be taken into consideration.") (emphasis added).

**22.** *See also* Dobbs, § 12.4(6) (collecting cases in footnote 10).

Of course, many contracts are made with the possibility of a future market downturn in mind—for example, contracts for delivery or sale of goods.[23] Indeed, such contracts are often made with the purpose of allocating the risk of future market swings between the parties.[24] But when both parties' success depends on a relatively stable market, it cannot be said that a subsequent, unforeseen market crash was within the parties' contemplation, at least not without any evidence to suggest that it was.[25]

---

**23.** *See, e.g., SEC v. Commodity Options Int'l, Inc.,* 553 F.2d 628, 631 (9th Cir.1977) (market's rise and fall specifically contemplated in the contract); *Lawrance v. Elmore Bean Warehouse,* 108 Idaho 892, 702 P.2d 930, 932–33 (Ct.App.1985) ("It appears Elmore risked a change in the market price by signing to buy the beans at a fixed price."); *Bd. of Educ. v. Broadwell,* 117 Okla. 1, 245 P. 60, 62 (1925) (the parties must "have contemplated that if plaintiff breached his contract to purchase said bonds at that price, and the bond market declined, that defendant could not and therefore would not sell same for less and would be compelled to hold such bonds").

**24.** *See, e.g., R.J.B. Gas Pipeline Co.,* 813 P.2d 14, 24 (Okla.Ct.App.1990) (a "take-or-pay clause" in the contract means "the parties ... are assumed to have allocated the risk" of a market downturn); *W.S. Forbes & Co. v. Pearson,* 87 S.C. 67, 68 S.E. 964, 964 (1910) (contract provided: "Margins to cover any decline in the market shall be deposited by the buyer promptly on demand of the seller[.]"); *Paxton & Gallagher v. Pellish,* 43 Wyo. 182, 299 P. 708, 708–10 (1931) ("[T]he plaintiff's agent, who sold the goods to the defendants, wrote into the contract the clause ... 'price guaranteed against decline to December 31, 1928,' " which "guaranteed against a 'decline' in [market] price"). Thus, evidence of post-breach market conditions can certainly be relevant if the parties contemplated a decline in the market.

**25.** *See, e.g., Prod. Credit Ass'n v. Alamo Ranch Co.,* 989 F.2d 413, 415 (10th Cir.1993) (because the parties "estimated that it would require one-half of the proceeds [of a cattle sale] to reduce the feed bill to a zero balance," they "did not contemplate that fifty percent of the proceeds would not cover [the] feed bill" after the "fat cattle market sharply declined in the time period between [the] estimation and the eventual sale"); *W.A. Lighter & Co. v. U.S. Shipping Bd. Emergency Fleet Corp.,* 24 F.2d 536, 537 (D.La.1928) ("[I]n view of the fact that the contract contemplated a reasonable time of delivery, and not a specified delivery, or a delivery for a particular market, where a loss might be occasioned by a decline in the market value of the goods, it is my conclusion that the shipper would not be entitled to damages for a loss in consequence of a decline in the market price of the goods. ..."); *Reliance Acceptance Corp. v. Hooper–Holmes Bureau,* 139 Cal.App. 607,

 Such is the case here, as both Landlords and Tenants were relying on the success of the towers. Indeed, the ground leases provided for Landlords' rental income to more than double following construction of the towers, from $64,734.58 prior to construction [26] to $130,260.83 following full construction,[27] with further increases thereafter based on the "fair rental value" of the premises. Thus, Landlords' income from the leases was dependent on Tenants' success in constructing and running the towers.[28] Testimony about the income projections produced by Tenants revealed that, by use of capitalization rates,[29] Tenant and NML took into account the normally expected risk of vacancy in the apartments.[30] With no suggestion that the market swing described by Landlords as "cataclysmic" was contemplated,[31] we cannot say that

---

34 P.2d 762, 766 (1934) ("[T]hat the market value of the security declined during the period involved between purchase of the contract and the subsequent repossession, was not within the contemplation of the parties...").

26. $32,321.25 for Tower I plus $32,413.33 for Tower II.

27. $65,038.33 for Tower I plus $65,222.50 for Tower II. During construction, the monthly rent would increase based on the number of units completed to date.

28. Indeed, if Tenants went bankrupt, they would not likely be able to pay even the pre-construction rent over the 90–year term of the leases.

29. A capitalization rate is defined as "the rate of interest used to calculate the present value of an investment or property that will provide an income in the future." Cambridge Business English Dictionary (2011), available at http://dictionary.cambridge.org/dictionary/business-english/capitalization-rate?q=capitalization%8 Frates.

30. Tenants' expert witness, when asked: "Is there any uncertainty ... in the conclusions that you have expressed here today?", explained: "The uncertainty is captured in the capitalization rates. It [is] also captured in the 6.5 percent time value of money rate. That rate includes a risk premium, and that is the amount over and above a risk-free rate. And a risk premium is a reflection of risk. So it does incorporate risk."

31. At the hearing on the motion, Landlords' counsel referred to the market downturn, which they intended to argue and prove, as "close to economic Armageddon" and the trial court summarized Landlords'

the trial court erred in excluding all evidence of it. We bear in mind, in reaching this conclusion, that a trial court's rulings on the admission of evidence are discretionary, so long as the correct rule of law is applied. *See Gasper,* 418 Md. at 619–20, 17 A.3d at 690–91.

Our conclusion is reinforced when we consider that market projections of Tenants and NML made in furtherance of the contract were not contradicted by Landlords. Rather, they declined to produce any projections of future profits based on conditions during the contract. Landlords must have made their own market projections in anticipation of the ground leases, given that their expected revenue was just as dependent upon the rental market as that of Tenants. But, despite clear and repeated rulings by the trial court against use of post-breach market evidence for 2009 or 2010, Landlords declined to offer any evidence of market projections made during the 2006–2007 time period. Indeed, at oral argument, when asked by Judge Battaglia why they failed to introduce such evidence, in the face of the trial court's rulings, Landlords simply reiterated their belief that 2009–2010 evidence should have been admitted.[32] Landlords' view of the market

---

argument as comparable to the difference between the "boom[ ] after Reagan" and "the misery index after Carter."

32. Judge Battaglia asked Landlords' appellate counsel:

If [trial] counsel couldn't prove his or her case, going the way he or she wanted to ... isn't it incumbent upon trial counsel then to shift gears and ... try to dispel the notion, taking assumptions that they don't necessarily believe in, that there would have been profits? ... Just assume that you have the same situation that you had at trial, would it have been incumbent upon trial counsel then to, instead of saying no profits ... trying to dispel them in a rosier economy that didn't happen?

Landlords' appellate counsel responded:

Trial counsel was not told to sit down and shut up. . . . [T]rial counsel was allowed to cross-examine, for example about interest rates applied and calculations, but that tips the thing two degrees, maybe. The problem here was the underlying assumptions for the projections. And that's where the case was going to be won or lost by the defense. And that's where the defense was told, you can't touch that, don't mention a word about it. This jury's going to come down with its decision based on how things looked four years ago.

as of the time of contracting would certainly have been relevant, but as they clarified in their opposition to Tenants' motion to exclude post-breach evidence, their proffered experts were prepared to testify only as to "what the market actually is/was at the time the Project would have been available for rent" to show that Tenants' "earlier projections . . . have now—given the downturn of the real estate market—proven to be unrealistic." They reiterated at the hearing on the motion that their experts were going to testify as to "how the market performed after time, over time . . . [w]hen the towers would have been delivered."

 Thus, Landlords failed to contradict Tenants' view of the parties' expectations for profit at the time of contracting. They did not offer evidence of their own market projections, and did not point to any market indicators [33] that may have made the crash objectively foreseeable. Without anything to contradict the projections put forth by Tenants, the trial court was acting reasonably when it concluded that the crash was not within the parties' contemplation.[34] *See Prod. Credit,* 989 F.2d at 418 (market decline unforeseen where "the parties never addressed the possibility"); *W.A. Lighter,* 24 F.2d at 537–38 (parties' contemplation at the time of contracting showed that there was no liability for the decline in the market); *Reliance Acceptance Corp.,* 34 P.2d at 765–66 (using the terms of the contract to deduce that the parties did not contemplate the decline in the market value of the security at issue).[35]

---

**33.** A market indicator is "something that gives information about possible future changes in the prices of shares, etc. in the stock market." Cambridge Business English Dictionary (2011), *available at* http://dictionary.cambridge.org/dictionary/business-english/market indicator?q=market + indicator.

**34.** Landlords further complain that the damages award is unfair because it was based on Tenants *pro formas,* whose "very purpose . . . [was] to demonstrate a positive cash flow to attract a potential investor in a venture." Yet the award was also based on the *pro formas* prepared by NML, which had the countervailing incentive to scrutinize the project's viability before investing.

**35.** *But see Valtrol Inc. v. Gen. Connectors Corp.,* 884 F.2d 149, 153 (4th Cir.1989) (parties' alteration of a distributorship contract showed that

We are not persuaded by Landlords' thesis that post-breach market evidence is *always* required to prove lost profits with reasonable certainty. *See Corbin, supra,* § 56.20 (consequential lost profits can be proved simply with the "past history" of the business operation); Dunn, *supra,* § 1.20–22 (explaining that the foreseeability of lost profits can be inferred from the contract, negotiations in contracting, or later communications between the parties). Some of our consequential lost profits cases, while not explicitly addressing which market projections were relevant, appear to adhere to the principle that the parties' contemplation controls. For example, in *Automatic Retailers of Am., Inc. v. Evans Cigarette Serv. Co.,* we affirmed a lost profits award, refusing to consider post-breach circumstances that "might have changed" the amount, instead holding that the plaintiff's "long history" in the business was sufficient evidence of the profits that it would have made "for its services during the applicable period." 269 Md. 101, 109–10, 304 A.2d 581, 586 (1973); *see also Sumwalt Ice & Coal Co. v. Knickerbocker Ice Co.,* 114 Md. 403, 417, 80 A. 48, 51 (1911) (holding that "declarations ... made more than six months or a year after the commission of the wrong complained of, were too remote and were properly excluded"); *U.S. Tel. Co. v. Gildersleve,* 29 Md. 232, 250 (1868) ("[I]f the special circumstances under which the contract was actually made, were communicated by the plaintiff to the defendant, and thus known to both parties, the damages resulting from the breach of such a contract which they would reasonably contemplate, would be the amount of injury which **would ordinarily follow** from a breach of a contract under these special circumstances so known and communicated." (emphasis added)).

Landlords contend that looking only to the parties' expectations at the time of contracting creates a windfall for Tenants by "award[ing] damages based upon a fictional market, which was far sunnier than the real market into which each Tenant would have delivered its product." Tenants respond that the

---

the "disruption" in performance caused by a market downturn was "foreseeable" and the resultant losses "allocable by contract").

appearance of a windfall in this case is "illusory," as a drastic change in the market post-breach will cause one party more harm than the other "no matter which standard is chosen." We agree with Tenants on this point. The only reason Tenants benefitted from the exclusion of post-breach market evidence is that the market declined post-breach. But whether post-breach market evidence would increase or decrease an award, we think it irrelevant to the measure of consequential damages—that were clearly within the contemplation of the parties when the contracted—measured at the time of breach.[36]

The Second Circuit explained why measuring damages at the time of breach, rather than the time of trial, is preferable:

Measuring contract damages by the value of the item at the time of breach is eminently sensible and actually takes expected lost profits into account. The value of assets for which there is a market is the discounted value of the stream of future income that the assets are expected to produce.... New York courts have thus explicitly upheld damage awards based on "what knowledgeable investors anticipated the future condition and performance would be at the time of breach" and have rejected awards based on what "the actual economic conditions and performance" were in light of hindsight.... [A]ppellants are unclear about the time at which damages are to be determined under the rule they espouse. Certainly they are not entitled to select the precise date on which the vessels had their highest value or a period of time that was profitable but that excludes periods where losses occurred. If the time of trial governed, the rule would be a two-edged sword.... New

---

**36.** Landlords are not helped in this argument by their citation to the Restatement (Second) of Contracts § 348 (1981), which deals with contracts "conditioned on a fortuitous event [when] it is uncertain whether the event would have occurred had there been no breach[.]" To apply this provision here, we would have to say that every real estate contract is conditioned on the "fortuitous event" that the market will not crash, which is not a fair interpretation.

York courts have expressly refused to adopt this "wait and see" theory of damages. (Citation omitted).

*Sharma v. Skaarup Ship Mgmt. Corp.,* 916 F.2d 820, 826 (2d Cir.1990).

Landlords further complain that excluding post-breach evidence encourages "strategic litigation," as potential plaintiffs would be able to sit back during the three-year statute of limitations[37] to see if the market rises or falls. If it rises, they say, plaintiffs should simply ignore the breach and strike a more profitable deal elsewhere; if it falls, plaintiffs should sue, getting the "windfall" of having their damages measured according to pre-breach projections. Landlords argue that such was Tenants' course of action here, waiting until the real estate market crashed to file for damages.

We disagree that Tenants' behavior in this case evidenced any kind of gamesmanship. They attempted for more than a year to secure Landlords' performance under the ground leases, even obtaining an injunction for such performance. That was no strategic "wait-and-see" tactic, but was an attempt to move forward with the project. Similarly, suing for damages once the breach had made the project impossible was not gamesmanship. Landlords cannot seriously contend that Tenants should have continued to employ lawyers in an attempt to secure estoppel certificates and move forward with a project that had lost its funding and permits. After Landlords' prolonged breach, which happened to extend into a severe market downturn, Tenants' only reasonable course of action was to sue for damages.[38]

---

37. *See* Md.Code (1973, 2006 Repl.Vol.) § 5–101 of the Courts and Judicial Proceedings Article (three-year statute of limitations for civil actions); *Shailendra Kumar, P.A. v. Dhanda,* 426 Md. 185, 194, 43 A.3d 1029, 1033–34 (2012) (applying the three-year statute of limitations to a breach of contract).

38. Landlords complain that it is "incongruous" that Tenants were permitted to mention the market downfall to explain their inability to obtain substitute performance, but Landlords were not permitted to mention the market downfall to show a lack of damages. Yet, what a plaintiff may say in response to a mitigation defense is not logically

## Sorrento as Intermediary

We next address Landlords' argument that Tenants' plans to create a separate corporate entity to operate the towers undermined the causation element of the damages claim. The Court of Special Appeals rejected this argument:

> The fact that [Tenants] may have subsequently assigned their interest in the ground leases to a new entity if the financing had in fact occurred does not negate causation as a matter of law for breach of contract damages.... [Tenants] held the interest in the ground leases, had obtained financing and county approvals, and had incurred significant expenses. The fact that [they] may have intended to form another entity, to serve as assignee had no breach occurred, does not change the fact that [they] were parties to the contracts and sustained damages caused by [Landlords'] breach(es).

*CR–RSC,* 202 Md.App. at 334, 32 A.3d at 472.

Landlords challenge this ruling, urging that we reverse the damages judgment "for lack of proximate causation and for failure to name the real plaintiff in interest." This is because, they say, "most of the ... lost profit damages ... would have belonged to Sorrento, which would have in turn paid most of those profits to NML[.]" Thus, Landlords claim that the jury improperly awarded Tenants damages that would have gone to another entity.

Tenants rely on the Court of Special Appeals' analysis and also point out that Landlords "blocked Sorrento from participating by refusing to consent to an assignment of the grounds leases" and therefore "can hardly raise a party-in-interest defense when they are the ones responsible for the missing party's absence."

Maryland Rule 2–201 provides: "Every action shall be prosecuted in the name of the real party in interest[.]" [39]

---

subject to the foreseeability rule, as the need for mitigation cannot be contemplated by the parties at the time of contracting.

**39.** Certain exceptions to this rule do not apply here. *See* Md. Rule 2–201 ("Every action shall be prosecuted in the name of the real party in

As Judge Harrell explained in *Mid–Atlantic Power Supply Ass'n v. Public Service Comm'n,* "the trend has been to define a real party in interest as: 'A person entitled under the substantive law to enforce the right sued upon and who generally, but not necessarily, benefits from the action's final outcome.'" 361 Md. 196, 221, 760 A.2d 1087, 1100 (2000) (Harrell, J., dissenting) (quoting Black's Law Dictionary 1143 (7th ed.1999)).[40] Thus, given that Tenants were named in the ground leases, the breach of which caused them to lose profits under a collateral agreement made pursuant to the ground leases, it is clear that they were the party entitled to enforce the breach and seek compensation for the damages thus incurred. Landlords provide no competing analysis.

We now turn to Landlords' proximate cause arguments. We detailed the proximate cause standard in *Pittway Corp. v. Collins:*

---

interest, except that an executor, administrator, personal representative, guardian, bailee, trustee of an express trust, person with whom or in whose name a contract has been made for the benefit of another, receiver, trustee of a bankrupt, assignee for the benefit of creditors, or a person authorized by statute or rule may bring an action without joining the persons for whom the action is brought.").

**40.** *See also South Down Liquors, Inc. v. Hayes,* 323 Md. 4, 7–8, 590 A.2d 161, 162–63 (1991) ("With the exception of a few illustrations, neither rule [2–201 nor Federal Rule of Civil Procedure 17(a)] attempts to define who is, or is not, a real party in interest in any specific context. Professor June Entman suggests it is 'well settled ... that a 'real party in interest' is one who, under the substantive law, has the right to bring and control the action, and that this person is not necessarily the beneficially interested party.' Entman, *More Reasons for Abolishing Federal Rule of Civil Procedure 17(a): The Problem of the Proper Plaintiff and Insurance Subrogation,* 68 N.C. L.Rev. 893, 900 (1990) citing, *inter alia,* 6A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1543 at 334 (2d. ed.1990) (the real party in interest is 'the person who, according to the governing substantive law, is entitled to enforce the right'); Kennedy, *Federal Rule 17(a): Will the Real Party in Interest Please Stand?,* 51 Minn. L.Rev. 675, 678 (1967) ('Thus the real party is the one with legal power to control the lawsuit and may be different from the person who will ultimately be benefitted if the suit is successful.'); Simes, *The Real Party in Interest,* 10 Ky. L.J. 60, 61 (1921) ('The real party in interest is the one to whom the substantive law of the case gives the right to bring and control the action.').").

To be a proximate cause for an injury, the negligence must be 1) a cause in fact, and 2) a legally cognizable cause. . . . The first step in the analysis . . . is an examination of causation-in-fact to determine who or what caused an action. The second step is a legal analysis to determine who should pay for the harmful consequences of such an action.

Causation-in-fact concerns the threshold inquiry of whether defendant's conduct actually produced an injury. . . .

\*　　　\*　　　\*

Once causation-in-fact is established . . . the proximate cause inquiry turns to whether the defendant's negligent actions constitute a legally cognizable cause of the complainant's injuries. This part of the causation analysis requires us to consider whether the actual harm to a litigant falls within a general field of danger that the actor should have anticipated or expected. . . . (Citations, footnotes, and quotation marks omitted.)

409 Md. 218, 243–46, 973 A.2d 771, 786–88 (2009).

▮▮▮▮▮▮ Applying the above framework to this case,[41] it is clear that there was sufficient evidence to show that Landlords' breach was the "cause-in-fact" of Tenants' losses. Testimony from NML's Director of Field Production Nicolas Jahnke confirmed that NML was planning to close the financing deal by the end of 2006, but Landlords' refusal to provide unconditioned estoppel certificates and their administrative actions challenging the site plan amendments scuttled the deal. This causal chain from Landlords' breach to Tenants' damages is not seriously challenged by Landlords. Nor do

---

**41.** Proximate cause analysis applies in contract actions as well as tort actions. *See, e.g., Wlodarek v. Thrift*, 178 Md. 453, 462, 13 A.2d 774, 779 (1940) (recovery dependent upon finding "that the plaintiff suffered other than nominal damages . . . as the proximate result of the breach of contract by the defendants"); *Simard v. Burson*, 197 Md.App. 396, 415, 14 A.3d 6, 17 (2011) ("Under both tort and contract law, one claiming damages must prove that tortious act or breach of contract was the proximate cause of the damages claimed." (quoting *MLT Enters. v. Miller*, 115 Md.App. 661, 674, 694 A.2d 497, 504 (1997))); Corbin, *supra*, § 55.7 (explaining that "proximate causation," in contract law, usually refers to foreseeability).

Landlords provide any analysis as to why their actions were not a "legally cognizable cause" of Tenants' injuries, except to maintain that Tenants are not the real parties in interest. We answered that question above.

Nevertheless, Landlords seek "a new trial to determine the **amount** of profits which Tenants would have themselves lost as a proximate result of Landlords' breaches." (Emphasis added.) [42] This is because, Landlords say, Tenants planned to operate Tower I through Sorrento, which NML and Tenants were to own "as 90/10 partners," with cash flow being split 90% to NML at first, and then 60% to NML following a 10% cumulative preferred return. Thus, Landlords argue that it "would be a perversion of Maryland law for Tenants to recover tens of millions of dollars that never would have belonged to them even in the hypothetical economy of their *pro formas.*" Tenants respond that the Sorrento financing plan was only one of the options available for Tower I, and that a different plan could have been used.

▓▓▓ Judge James Eyler writing for the Court of Special Appeals considered this issue:

> The fact that [Tenants] may have subsequently assigned their interest in the ground leases to a new entity if the financing had in fact occurred does not negate causation as a matter of law for breach of contract damages. The Memorandum of Understanding entered into between NML and [Tenants] regarding financing for the project contemplated that the venture would either move forward by "forming" a new entity, Sorrento, or by purchasing an existing company. The loan commitment provided [Tenants] the right to assign the loan commitment to another entity; it did not require it to do so. The loan commitment, signed by Olav Kollevoll as [Tenants'] representative, identified Sorrento as an entity "in the process of being formed

---

42. Indeed, it is incongruous for Landlords to assert that the plan to funnel profits through Sorrento broke the chain of causation to Tenants, given that this alternative argument clearly explains how profits would have flowed to Tenants.

by [Tenants]." [Tenants] held the interest in the ground leases, had obtained financing and county approvals, and had incurred significant expenses. The fact that [Tenants] may have intended to form another entity, to serve as assignee had no breach occurred, does not change the fact that [Tenants] were parties to the contracts and sustained damages caused by [Landlords'] breach(es). The continuing nature of the initial breach prevented pursuit of the project. Furthermore, the declaratory judgment entered on April 4, 2007, affirmed on appeal, identified [Tenants] as the damaged parties. It is too late to re-litigate this issue.

*CR–RSC,* 202 Md.App. at 334, 32 A.3d at 472. We adopt the opinion of the Court of Special Appeals on this issue.

### Attorney–Client Privilege

The issue of whether Landlords waived the attorney-client privilege here presents an application of the waiver doctrine that we have not previously addressed-whether a **defendant** may waive the privilege through testimony. The Circuit Court held that Landlords had waived the privilege, and the Court of Special Appeals agreed. Landlords raise this novel issue—and diverse others—about the privilege in their efforts to win a new trial.

Landlords contest "one, and only one, attorney-client communication[:] the 'stop the bastards' email of April 9, 2007." [43] Landlords attack admission of this communication into evidence on two fronts. First, they assert that there was no waiver of the privilege with regard to the email because they did not formally raise an "advice of counsel defense," but "simply denied Tenants' allegations of bad faith." [44] Land-

---

**43.** The Court of Special Appeals ruled that Landlords had not alleged the privilege with sufficient particularity as to anything but the "bastards" email. *See CR–RSC,* 202 Md.App. at 365, 32 A.3d at 490. Tenants reiterate this point in their brief, to which Landlords respond that their assertion of error is limited to the email. Such limitation is confirmed in Landlords' petition for *certiorari,* which mentions only the email.

**44.** Tenants' amended complaints of October 9, 2009, and March 1, 2010, alleged bad faith.

lords would have us limit waiver by a defendant to instances when an "advice of counsel defense" was raised by the pleadings. Second, Landlords aver that their testimony, in which they used the advice of counsel to explain their actions, "described only the circumstances of the attorney-client communications, not the content." They argue that the deposition was

> merely the sort of questioning that Landlords needed to allow under Discovery Guideline 6[ (c) ].[45] If such truthful deposition responses constitute a waiver, it is difficult to see how any party defending against a charge of bad faith can preserve the attorney-client privilege and still comply with its discovery obligations.

Tenants respond that "Landlords' contention that they did not 'formally' assert advice of counsel in a pleading sidesteps the key point," which is that the waiver resulted from Landlords' attempt to rely on advice of counsel "to avoid candidly explaining why Landlords breached." In Tenants' view, "if the defendant voluntarily chooses to establish his blamelessness by pointing to advice of counsel, the privilege is waived as to that advice."

### A. Waiver of Attorney–Client Privilege, Generally

 The basics of this salient evidentiary privilege guide us. Attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law." *Newman v. State*, 384 Md. 285, 300–02, 863 A.2d 321,

---

**45.** The Maryland Discovery Guidelines, "although not part of the Maryland Rules, have been recognized by this Court ... as valuable tools for practitioners to interpret and apply the discovery rules." *Rodriguez v. Clarke*, 400 Md. 39, 61–62, 926 A.2d 736, 749 (2007) (citation omitted). Discovery Guideline 6(c) provides:

> After a claim of privilege has been asserted, the attorney seeking disclosure should have reasonable latitude during the deposition to question the witness to establish other relevant information concerning the assertion of privilege, including (i) the applicability of the particular privilege being asserted, (ii) circumstances which may constitute an exception to the assertion of the privilege, (iii) circumstances which may result in the privilege having been waived, and (iv) circumstances which may overcome a claim of qualified privilege.

330 (2004) (quoting *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584, 591 (1981)). Judge Battaglia, writing for the Court in *Newman v. State,* explained the purpose of the privilege as "an accommodation of the competing public interests of the need to promote candor in communications between attorneys and their clients and the general testimonial compulsion to divulge relevant evidence in the pursuit of truth and justice." *Id.* Although this privilege is "essential to an effective attorney-client relationship" and "prevents the disclosure of a confidential communication," it "is not absolute." *Id.* at 302, 863 A.2d at 330–31.

One way in which the privilege is "not absolute" is that "[w]aiver may be effected by the client's testifying to a significant part of the privileged confidential information." *Greenberg v. State,* 421 Md. 396, 404, 26 A.3d 955, 960 (2011) (quoting 6 Lynn McLain, *Maryland Evidence State & Federal* § 503:15 (2d ed.2001)). As we explained in *Harrison v. State:*

Generally, the client's offer by his own testimony as to a specific communication with his attorney constitutes a waiver as to all other communications to the attorney on the same subject matter. The attorney's testimony concerning such communications thus becomes admissible by virtue of the client's voluntary testimony in that regard.

276 Md. 122, 136, 345 A.2d 830, 839 (1975).

Although there are exceptions to this waiver doctrine,[46] one established application of it is when a witness attempts to use the attorney-client privilege as both a "sword" and a "shield." As the United States Court of Appeals for the Eighth Circuit has opined:

The attorney client privilege may also be implicitly waived, and one way that is done is by raising attorney advice as a defense. . . . Workman's trial counsel placed [the

---

**46.** Indeed, *Harrison,* after stating the general rule, applied one of the exceptions: "that there is no waiver of the privilege, where the subject matter of the communication with the witness' attorney has been first elicited upon cross-examination[.]" *Harrison v. State,* 276 Md. 122, 147, 345 A.2d 830, 844 (1975).

attorney's] advice in issue by asserting that Workman had relied on the advice in cashing the checks. Workman cannot selectively assert the privilege to block the introduction of information harmful to his case after introducing other aspects of his conversations with [his attorney] for his own benefit. The attorney client privilege cannot be used as both a shield and a sword, and Workman cannot claim in his defense that he relied on [the attorney's] advice without permitting the prosecution to explore the substance of that advice. (Citations omitted.)

*United States v. Workman,* 138 F.3d 1261, 1263–64 (8th Cir.1998).

We recognized a similar waiver doctrine in *Parler & Wobber v. Miles & Stockbridge, P.C.,* a case involving a professional corporation that was sued for legal malpractice. 359 Md. 671, 756 A.2d 526 (2000). The defendant responded by filing a third party claim against the lawyers then representing the plaintiffs, claiming contribution or indemnification based on the latter's negligence. *Id.* at 677–78, 756 A.2d at 529. In applying the doctrine against the defendant-corporation, we said: "a privileged party cannot fairly be permitted to disclose as much as he pleases and then to withhold the remainder to the detriment of the defendant." *Id.* at 693, 756 A.2d at 538 (quoting *Greater Newburyport Clamshell Alliance v. Public Serv. Co. of N.H.,* 838 F.2d 13, 20 (1st Cir.1988))(internal quotation marks omitted).

### B. Waiver of Attorney–Client Privilege by Defendants

Landlords argue that "[t]his Court has never actually held a **defendant** to have waived the attorney-client privilege under the facts of any case." (Emphasis added). Other than the *Parler* defendant, who filed a third-party claim, this is true, although not outcome determinative, because we have never addressed facts like these. They further aver that "[t]his Court has never found a party to have placed attorney-client communications 'at issue' where the party's own pleadings did not affirmatively inject the issue into the case[,]" citing *Ehrlich v. Grove,* 396 Md. 550, 574 n. 14, 914 A.2d 783, 798 n. 14

(2007).[47] Landlords propose this much stricter standard for waiver, when applied against a defendant. Yet, Landlords advance no policy reason why defendants should be immune from waiver principles, and our quest is to determine whether there are sound reasons to exclude defendants from the usual application of the waiver doctrine.

Our study of the issue starts close to home, as our own Court of Special Appeals has recognized that an implied waiver **could** be applied against defendants based on testimony, in three cases.[48] In one of these cases, that court said:

> A party waives his attorney-client privilege when the party relies on the advice of counsel **as an element of his defense.** In other words, the client cannot use the advice of counsel as a sword to prove his case but then assert the privilege as a shield to prevent disclosing harmful information. (Emphasis added and citation omitted).

*ST Sys. Corp. v. Md. Nat'l Bank,* 112 Md.App. 20, 35, 684 A.2d 32, 39–40 (1996). Neither in *ST Systems* or the other two Court of Special Appeals cases, though, has waiver of the privilege by the defendant actually been found. The United States Bankruptcy Court for the District of Maryland, however, applied *ST Systems,* ruling that defendants, as well as plaintiffs, can be held to have waived the privilege if they brought up conversations with counsel for their own benefit. *In re Nazarian,* 18 B.R. 143, 147 (Bankr.D.Md.1982) ("Maryland law establishes that when a client, through his testimony, puts at issue a specific communication with his attorney, the

---

**47.** We address this case *infra.*

**48.** *See ST Sys. Corp. v. Md. Nat'l Bank,* 112 Md.App. 20, 35, 684 A.2d 32, 39–40 (1996) (privilege waived if advice of counsel is an element of the defense); *Fraidin v. Weitzman,* 93 Md.App. 168, 228, 611 A.2d 1046, 1076 (1992) (privilege waived if defendant claims "his counsel advised him that he could do this"); *Manown v. Adams,* 89 Md.App. 503, 515, 598 A.2d 821, 826 (1991) ("The requirement of full disclosure is imposed to prevent an advisee from using the defense as a shield when he or she has falsely omitted facts bearing upon the matter."), *vacated on other grounds, Adams v. Manown,* 328 Md. 463, 465–66, 615 A.2d 611, 612 (1992).

attorney's testimony becomes admissible because the client has waived his privilege. When [the defendant] chose to raise advice of counsel as a defense in this case, he waived the attorney-client privilege." (citation omitted)).

Searching outside Maryland, we find widespread application of the waiver doctrine to both plaintiffs and defendants. As a treatise on the privilege has explained, a client may waive the privilege by "affirmatively, albeit impliedly, relying on [counsel's] advice to support its denial of the plaintiffs' claims." 2 Paul R. Rice, *Attorney–Client Privilege in the United States* § 9:46 (2012). The treatise explained further:

> Allowing Defendants to make the naked assertion that they consulted with their attorneys would leave the fact finder with the impression that they had [shown good faith] even in [a] situation where they had not. And if Defendants are permitted to create this impression while still maintaining their attorney-client privilege, they would effectively be abusing the privilege—using it as both a shield and a sword. This is not allowed. (Citation and quotation marks omitted.)

*Id.* (quoting *Van Straaten v. Shell Oil Products Co. LLC*, No. 09C1188, 2010 U.S. Dist. LEXIS 98604, at *14 (N.D. Ill. June 8, 2010), *rev'd on other grounds*, 678 F.3d 486 (7th Cir.2012)).

Professor Wigmore, whose definition of the privilege we adopted in *Harrison*, 276 Md. at 135–37, 345 A.2d at 838–39, agrees:

> A privileged person ... cannot be allowed, after disclosing as much as he pleases, to withhold the remainder....
>
> * * *
>
> The client's offer of his own or the attorney's testimony as to a *specific communication* to the attorney is a waiver as to all other communications to the attorney on the same matter. This is so because the privilege of secret consultation is intended only as an incidental means of defense, and not as an independent means of attack, and to use it in the latter character is to abandon it in the former.

8 John H. Wigmore, *Evidence in Trials at Common Law* § 2327 (John T. McNaughton ed.1961); *see also* Edward J. Imwinkelried, *The New Wigmore A Treatise on Evidence: Evidentiary Privileges* § 6.12.4.b(2) (Richard D. Friedman ed., 2d ed. 2010) ("In principle, it should make no difference whether the litigant made the allegation as a plaintiff or defendant."); 12–5 Bender's Forms of Discovery Treatise § 5.02 (2012) ("If the advice of counsel becomes an issue in litigation, fairness may require full disclosure of the attorney's opinion . . . .").

Federal cases amply support applying this waiver doctrine against defendants. *See, e.g., United States v. Woodall,* 438 F.2d 1317, 1325 (5th Cir.1970) ("By offering his own testimony as to a part of the conversation relative to plea results, [the defendant] waived the right to claim the privilege as to the whole thereof."); *Sedillos v. Bd. of Educ. of Sch. Dist. No. 1,* 313 F.Supp.2d 1091, 1094 (D.Colo.2004) (defendant "cannot on the one hand claim as a defense that he relied on the advice of his counsel . . . while at the same time invoking the attorney-client privilege to prevent the plaintiffs from exploring fully the substance and circumstances of that advice") (citation omitted); *Handgards, Inc. v. Johnson & Johnson,* 413 F.Supp. 926, 929 (N.D.Cal.1976) (applying the "sword and shield" doctrine against the defendants, observing that "[t]he deliberate injection of the advice of counsel into a case waives the attorney-client privilege as to communications and documents relating to the advice"); *Daniels v. Hadley Mem'l Hosp.,* 68 F.R.D. 583, 589 n. 8 (D.D.C.1975) (applying the doctrine against the defendant, observing: "The client's offer of his own or the attorney's testimony as to part of any communication to the attorney is a waiver as to the whole of the communication . . . ." (citation and quotation marks omitted)); *In re Penn Cent. Commercial Paper Litig.,* 61 F.R.D. 453, 464 (S.D.N.Y.1973) (holding that the defendant's parent company had waived the privilege by allowing his attorney to testify about the relevant communication).

Cases from other states support this interpretation as well. *See, e.g., Elia v. Pifer,* 194 Ariz. 74, 977 P.2d 796, 804

(Ct.App.1998) ("[A] defendant [will] not be allowed to use privilege as a shield to block inquiry into an issue that he ha[s] raised."); *Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co.*, 623 A.2d 1118, 1125 (Del.Super.Ct.1992) (sword and shield doctrine "applies when **the party** holding the privilege waives the privilege, traditionally in one of two basic ways: (1) **the party** injects the communications themselves into the litigation, or (2) **the party** injects an issue into the litigation, the truthful resolution of which requires an examination of the confidential communications." (emphasis added)); *Savino v. Luciano*, 92 So.2d 817, 819 (Fla.1957) ("The anomaly of [the defendant's] position is immediately apparent: for the purpose of barring the discovery procedure, the audit and report is confidential and privileged; for the purpose of proving his case, it is not. . . . We hold, therefore, that the defendant in the instant case has either expressly or impliedly waived the right to insist upon the privileged nature, if any, of the audit and report."); *Carpenter v. Mass. Inst. of Tech.*, 19 Mass. L. Rep. 339 (Mass.Super.Ct.2005) (applying the "sword and shield" doctrine against the defendant university, holding that it had waived the attorney-client privilege); *Wardleigh v. Second Judicial Dist. Court*, 111 Nev. 345, 891 P.2d 1180, 1186 (1995) ("[W]aiver occurs when the holder of the privilege pleads a claim **or defense** in such a way that eventually he or she will be forced to draw upon the privileged communication at trial in order to prevail, and such a waiver does not violate the policies underlying the privilege." (emphasis added)); *Arnold v. City of Chattanooga*, 19 S.W.3d 779, 787 (Tenn.Ct.App. 1999) (quoting *Wardleigh*, 111 Nev. 345, 891 P.2d 1180).[49]

---

**49.** *See also Green v. Crapo*, 181 Mass. 55, 62 N.E. 956, 959 (1902) ("The privacy for the sake of which the privilege was created was gone by the appellant's own consent, and the privilege does not remain under such circumstances for the mere sake of giving the client an additional weapon to use or not at his choice."). *But see Marathon Oil Co. v. Moye*, 893 S.W.2d 585, 590 (Tex.App.1994) ("A person cannot claim privilege to pertinent evidentiary information while he simultaneously seeks affirmative relief. . . . A defendant raising a declaratory judgment counterclaim is not necessarily seeking affirmative relief." (citations omitted)).

Landlords disagree with these authorities, urging us to be guided by a footnote in our own decision in *Ehrlich v. Grove,* where we addressed a waiver of privilege issue, but not by testimony. In that suit by a former state employee against Governor Ehrlich, the employee alleged waiver of the privilege based on the Governor's supposed earlier production of documents similar to those refused. This footnote provides, in pertinent part:

**We reject Grove's argument asserting that the Governor waived attorney-client privilege by producing documents similar to the ones for which he is asserting the privilege** ... as being not on point. Grove argues that attorney client privilege assertions must be consistent. According to Grove, "a privileged party cannot fairly be permitted to disclose as much as he pleases and then to withhold the remainder to the detriment of the [opposing party]." This language ... came into Maryland when it was quoted in *Parler & Wobber v. Miles & Stockbridge,* 359 Md. 671, 693, 756 A.2d 526, 538 (2000). Both the First Circuit and this Court, in the two cases, used "defendant" where Grove disingenuously inserted "[opposing party]" in his brief.

**The cases were specifically directed at limitations on civil plaintiffs, not defendants,** and correctly used the original language to refer to the express and implied waiver principle, which has its basis in fairness and consistency, that a *plaintiff* may not use the attorney-client privilege as both a sword (using such privileged information to assert his claim) and a shield (while at the same time denying discovery to a defendant as to the balance of the privileged information) against a *defendant.* The present case is readily distinguishable ... because **the Governor is not a plaintiff and is not asserting a claim against Grove based upon the use of privileged information. The above principle of fairness and consistency does not, in this particular context, apply to this defendant. The principle of** *Parler & Wobber,* **to the extent previously applied in this State, relates to civil plaintiffs in professional**

**malpractice cases** .... *Parler & Wobber* simply has no applicability in the context of the present case. (Bold emphasis added).

396 Md. at 574–75 n. 14, 914 A.2d at 798–99 n. 14. Landlords rely on this *Ehrlich* footnote to support their argument that, as defendants whose **pleadings** did not place their good faith intent at issue, they were not subject to an implied waiver of the privilege. We are not persuaded.

To be sure, the Court in *Ehrlich* articulated a narrow view of implied waiver doctrine in explaining why the Governor did not waive the attorney-client privilege when he (allegedly) produced documents similar to the ones for which he later claimed the privilege. Yet, the Court was careful to qualify its comment about the *Parler & Wobber* doctrine, saying only that it **did not apply to the Governor's production of documents,** and that **"to the extent previously applied in this State,** [the doctrine] relates to civil plaintiffs in professional malpractice cases." *Id.* (emphasis added). The Court did not purport to set a steadfast rule that under different circumstances a defendant could not be said to have waived the privilege **through testimony.** Using a restrained approach, the *Ehrlich* Court went as far as it needed to, in distinguishing *Parler & Wobber,* to reach the conclusion that the Governor's earlier production of documents was not a waiver of the privilege.

Ehrlich's assertion of the privilege belatedly, in connection with document production, is strikingly different from offering up "attorney advice" as the only reason that prevented Landlords from providing the estoppel certificates, but refusing to disclose what the advice was. This is not a case of waiver by prior document production. Here, in stark contrast, the asserted basis of waiver is the affirmative testimony of several officers and employees of Landlords, both in depositions and at trial, in which they brought up conversations with their attorneys to answer questions about their reasons and motivations for certain actions. Landlords employed this strategy in an effort to prove that they acted in good faith in refusing to sign the estoppel certificates. And they did so with remarka-

ble consistency, beginning with the deposition of Floyd Davis Camalier on December 3, 2009, when the idea to hide behind the advice of counsel appears to have been hatched:

Q: Did you participate in the decision to take that position, namely we will not sign an estoppel certificate that says you are in compliance with the ground lease?

A: I may have had an opinion. I don't know what participate means. I'm just—I'm—I'm one of the family members. I had an opinion. I'm sure other people did as well.

Q: What was your opinion?

A: My opinion? My opinion—I was just following—I was just following—I was just following at that point in time.

Q: Who were you following?

A: I was following our group.

Q: Who?

A: Who? Well, we had the—we had all the parties together and that's how we made—a decision was made.

Q: Who was involved in making the decision?

A: There were lots of people. I don't remember who was at which meeting. The Davises and the Camaliers.

Q: Let's identify the exact human beings that were involved in the decision. . . .

\* \* \*

[W]ho of that group of human beings were you following?

A: Well, we—we were—we were—I mean, we were—we were just—we were sitting there. We were in a meeting in a conference room at our attorneys.

\* \* \*

Q: And what opinion did you express?

A: I don't know what I expressed—

Mr. Cooter: Just a minute. Just a minute.

The Witness: Sorry

Mr. Cooter: Is this a meeting where there's a lawyer involved?

The witness: Yes.

A: I instruct you not to answer.

\* \* \*

Q: Did you ever express an opinion about whether the family should take the positions they were taking on the estoppel certificate issue outside the presence of lawyers?
A: I don't think I ever discussed it outside of the attorneys.

In subsequent depositions, Landlords used the same strategy of claiming that their business decisions were based on the advice of counsel, and therefore that they could not say anything more about their motivations. For example, Floyd E. Davis, III, repeatedly refused to answer questions about his personal reasons for opposing Tenants' site plan approvals, pointing simply to counsel's advice:

Q: My question goes to whether you had any business purpose, not a legal strategy or legal analysis that you may have talked about with Hogan & Hartson. Was there any business reason for attacking the site plan approvals in the two lawsuits that had been filed in Montgomery County?
A: Once again, I can't separate that out, because we discussed—we really didn't discuss that outside of counsel. We discussed everything with counsel. The business aspects of it, everything.

\* \* \*

Q: Your testimony is you just surrendered all independent business judgment?
A: No.
Q: Did you make any independent business judgment in the fall of 2006, or did you just do what your lawyers told you to do?
A: It wasn't just the lawyers. But it was arriving at a consensus. I can't discuss it any further, that's all.

\* \* \*

Q: Your position in the fall of 2006 was you wanted apartments built on the land, you just wanted them built by somebody other than RSC?

A: Once again, all of this, our positions came out in consultation, you know, with counsel, and family members were there. That's all I'm going to say at this point.

\* \* \*

Q: What did you want to see happen with the land?

A: We're going around in circles. I mean, as I said before, I wanted to see apartments built. I wanted to see the land developed.

Q: Given your testimony that [you wanted to see apartments built], are you able to tell me why, if that was the truth, your family took the positions it took with respect to the estoppel certificate, between October 2nd, 2006 and April 2007?

\* \* \*

A: No, I can't answer that. I mean, I think I'm mixing apples and oranges. But basically at this point all our decisions were being made in consultation with counsel.

Similarly, Charles A. Camalier, III, when asked about his reasons for refusing to sign the estoppel certificates and for failing to back the project before the county, offered only his conversations with Hogan & Hartson:

Q: ... Was there anything that prevented [Landlords] from telling Park & Planning at the end of December 2006, while we weren't the ones who submitted the application to amend the site plan from condos to apartments, we're in favor of proceeding with the apartments?

A: Again, we were relying on our counsel, so—

Q: Independent of what Hogan & Hartson may have told you?

A: No, why would we go independent? We hired what we thought was the best law firm in town. We were relying on their advice.

Finally, John G. Davis employed the same strategy, bringing up conversations with Hogan & Hartson in answers to questions about his personal motivations for opposing Tenants' site plans and refusing to sign the estoppel certificates:

Q: Okay. And Judge McGann ordered you to dismiss your actions questioning the site plan approvals in April of 2007, correct?

A: Yes.

Q: You made a business decision not to dismiss them in April of 2007?

A. Based on advice from counsel.

\* \* \*

Q: Following the November 6, 2006 letter from RSC, did the Davis families reconsider the position that they had asserted prior to November 6th with respect to the estoppel certificates?

A: Any discussions/decisions we made concerning this letter was done with the guidance and advice of Hogan & Hartson.

\* \* \*

Q: Now, is it your contention in this litigation that the positions that were taken on your behalf by Hogan & Hartson were authorized by the Davis defendants?

A: We—we hired Hogan & Hartson for their advice. They advised us and came up with a game plan on how to move forward. They were driving the bus. I don't know—I'm not a lawyer. I wouldn't authorize them to send individual documents or whatever—

\* \* \*

Q: After getting recommendations from your lawyers on how to proceed, who made the decision to take the positions that the Davis defendants took?

A: Well, on advice of counsel, the partners are the—the three Davis brothers are the partners, so they made the decision.

Q: So do you accept responsibility for the decisions that were made?

A: Again, we—we relied on advice of counsel[.]

The trial court considered this deposition testimony key to its decision to grant Tenants' motion to compel discovery from Hogan & Hartson. The court reasoned that Landlords could not use their consultations with counsel unfairly to assert good faith while at the same time avoiding any investigation into the asserted basis of that good faith:

If we just had letters, and we had the defendants saying, look, in deposition it was our decision, we took counsel from them, and we have every opportunity to make our decision, and this is what we did, we thought the plaintiff was breaching, and all we did tell them is—you know, if it was just as simple as that, I wouldn't [compel discovery from Hogan & Hartson]. I'm not looking to open up another area. . . . [B]ut, certainly, it's a two-edge sword, and you can't come in and say, by the way, I didn't do anything wrong, and, yet, you can't hear from the person that I told to do something[.]

Even so, the trial court did not rule that any evidence discovered from Hogan & Hartson would necessarily be admissible. Instead, the trial court decided to "wait[ ] and see . . . [i]f [reliance on counsel] was going to be used as a defense" before allowing any of the Hogan & Hartson evidence into trial. He also specifically instructed Tenants not "to mention it in opening statement."

Yet at trial, Landlords brought up their privileged discussions once again, using the same coy strategy. The Court of Special Appeals described several such exchanges:

[T]he attorney for [Tenants] asked Mr. Camalier if he was aware that the continuing course of conduct of not providing unconditional estoppel certificates would result in a failure of financing for the RSC Towers. Mr. Camalier responded by stating that "[w]e were operating in good faith and operating pursuant to discussions with our attorney who felt we were doing nothing improper." Later, Mr. Camalier stated

We thought about it in that we sent the letter to our lawyers and asked them what, are we acting in good

faith? Are we acting within our rights under the ground lease? So, to the extent, yes, we saw what Mr. Hoffman said in his letter but we did not make an independent analysis. We sent it to our lawyer. This is what they're stating. Are we on solid ground, operating in good faith, which we were, and basically have we complied with the ground lease? We were advised, yes we were.

Mr. Davis also referred to the advice of counsel to explain why he refused to sign the estoppel certificates:

Q: Mr. Davis, is the statement in that letter that the reason you refused to sign the estoppel certificates was that you got negligent advice from Hogan & Hartson?

A: Yes.

Q: Is that a truthful statement?

A: Yes.

Mr. Davis also referred to the advice of counsel to avoid answering a question asked by [Tenants] as to whether he knew that reserving all rights under the estoppel certificates would result in the failure of the project to go forward:

Q: Mr. Davis, will you answer my question? My question is this. When you signed that letter purporting to reserve all rights, you knew that assertion was totally inconsistent with the business purpose for which an estoppel certificate is requested?

A: We signed the estoppel certificate that the Judge ordered and once again, I did not draft this letter. It was drafted by an attorney. I did sign it and reserving all rights, I thought reserved the rights that we had under the documents as we went to the Court of Appeals.

*CR–RSC,* 202 Md.App. at 366–67, 32 A.3d at 491. The record also contains several other examples of affirmative use of the privilege as a dodge against candid answers, such as when Davis mentioned that Landlords consulted with counsel before deciding to try to force Tenants to follow the original condominium plan:

We had hired Hogan & Hartson and I mean, they are a well known and respected law firm and they were advising

us, and once again, that does not mean I'm not taking responsibility but together with Hogan & Hartson, and other family members, we made the decisions that we did.

Davis was no more forthcoming when asked about the "business reason for" opposing the building permit for the apartment project: **"Business reason? I think it was the legal reason. We [just] wanted to make sure that, you know, that we as landowners sign the proper documents."** Given a second chance, he stone-walled again: when asked for "any business reason[,] if you wanted apartments to be built on the land[,] why you would challenge the fact that there is a building permit authorized by Montgomery County to build the apartment building," Davis answered, "I don't know." Never missing an opportunity, Davis continued to hide behind the privilege in response to other questions:

Q: One of the decisions you made was to ask the court system to stay Judge McGann's order to dismiss the building permit challenge?

A: Yes.

* * *

Q: Not a decision you had to make, one you chose to make?

A: In consultation with our attorneys, once again.

Q: And one of the things you did was you decided to send a letter on April 16, 2007 with the estoppel certificates that Judge McGann had required you to file with a cover letter reserving your rights. That was a decision you made, right?

A: In consultation with counsel, yes.

This conduct is a far cry from the mere disclosure of documents similar to privileged ones by the Governor in *Ehrlich*.[50] When defendants behave in this manner, bringing up conversations with attorneys to deflect questions about

---

**50.** The *Ehrlich* opinion does not specify exactly what other privileged documents were disclosed. *See generally Ehrlich v. Grove,* 396 Md. 550, 914 A.2d 783 (2007).

business justification, personal motivation, or intent, we enter a different realm of considerations than that posed in *Ehrlich.*

We see no principled distinction that would call for applying the doctrine of waiver of the privilege to a plaintiff, but not a defendant. It may be that there are more situations in which the waiver doctrine will be applied against a plaintiff, but the doctrine is based on fairness, and fairness cannot be one-sided. For a witness to disclose that he was acting "on the advice of" his attorney, and say no more, constitutes disclosure of "as much as he pleases." Wigmore, *supra,* § 2327; *Parler & Wobber,* 359 Md. at 693, 756 A.2d at 538. If this occurs, the trial court may find that the privilege has been abused, and that a waiver has occurred. The waiver doctrine is also grounded in the "truth-finding process" of trial. *See Permian Corp. v. United States,* 665 F.2d 1214, 1221 (D.C.Cir. 1981) ("Because the attorney-client privilege inhibits the truth-finding process, it has been narrowly construed . . . and courts have been vigilant to prevent litigants from converting the privilege into a tool for selective disclosure. The client cannot be permitted to . . . invoke the privilege as to communications whose confidentiality he has already compromised for his own benefit."); *see also State v. Walker,* 345 Md. 293, 328, 691 A.2d 1341, 1358 (1997) (referencing the "truth-seeking mission" of trial.)

### *The Nature of Statements Resulting in the Waiver of Attorney–Client Privilege*

Landlords further assert that authorities allowing waiver by a defendant should not have been applied to them because their testimony "described only the circumstances of the attorney-client communication, not the content[.]" According to Landlords, their testimony was simply a denial of Tenants' allegations of bad faith. Thus, they contend that if the above precedents were applied to them, their only options while testifying would have been to concede bad faith or waive the privilege.

 We agree with Landlords that a "client's simple denial of an allegation by the opposing side that an act was committed with a particular intent does not inject advice of counsel into the case, even though that advice may have been the reason why the intent was not present." Rice, *supra,* § 9:46. The waiver doctrine certainly leaves room for a defendant to deny bad faith without waiving the attorney-client privilege. Yet what defendants cannot do is defend a charge of bad faith **by referencing specific communications with attorneys** that purportedly provided a good-faith basis for certain actions, and then refuse to allow any further investigation into those communications. This is because allowing a defendant to "make the naked assertion that they consulted with their attorneys . . . leav[es] the fact finder with the impression that they had [shown good faith] even in [a] situation where they had not." *Id.* (quoting *Van Straaten,* 2010 U.S. Dist. LEXIS 98604, at *14). Such tactics would allow the defendant to use the attorney-client communication to his benefit and then refuse to answer more questions about it. This would be an abuse of the privilege—using it both as a sword and a shield.

 The quoted testimony amply shows that Landlords attempted to use the attorney-client privilege as a sword and shield. They did not simply deny bad faith and refuse to answer questions about attorney-client communications. Indeed, Tenants' counsel repeatedly clarified that they were not seeking information about attorney-client communications, but instead wanted to know what was in the minds of the individual Landlords when they took certain actions.[51] As in *Workman,* each Landlord "claim[ed] in his defense that he relied on

---

**51.** Accordingly, the exception stated in *Harrison*—that there is no waiver when the "subject matter of the communication with the witness' attorney has been first elicited upon cross-examination"—does not apply here, as the subject matter was not "elicited" but offered up of Landlords' own accord. *See Harrison,* 276 Md. at 152, 345 A.2d at 847 (cross-examination questions were "directed to the dialogue between Harrison and the counsel then representing him and the discussions between them"). Additionally, the communications here were first offered not on cross-examination, but in depositions.

[counsel's] advice without permitting [Tenants] to explore the substance of that advice." *See* 138 F.3d at 1264. This is not allowed because it is not fair and undermines the "truth-seeking mission" of a trial.

Of course, the information sought from the defendant must be relevant, or likely to lead to the discovery of relevant information, to an issue at trial. Thus, we examine the question of why Landlords' business reason, or other motivation or reasons for acting, was relevant to this suit.[52] This issue is debated by the parties, with Landlords asserting that their intent in pursuing the administrative actions and refusing to give the estoppel certificates was not relevant. After a close review of the record, we conclude that the business reasons or Landlords' other intent or motivation, were relevant both because of the allegations of the complaint, as amended, and because of the defenses raised by Landlords.

With respect to the allegations in the complaint, every contract contains an implied covenant of good faith and fair dealing.[53] Tenants, in their amended complaint, alleged a breach of the implied covenant, in addition to other breaches of the contract, placing Landlords' intent and motivations in issue. Landlords' motivations became even more relevant when they offered two defenses on the damages issue: argu-

---

52. Landlords did not argue that the question was not relevant. They simply answered by referring to attorney advice. Yet, since we address waiver of the privilege, we think relevance arises in a different context and is appropriate to consider independent of any objection or lack thereof.

53. *See Blondell v. Littlepage*, 413 Md. 96, 114, 991 A.2d 80, 90–91 (2010) ("[T]he covenant of good faith and fair dealing ... simply prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract. In short, while the implied duty of good faith and fair dealing recognized in Maryland requires that one party to a contract not frustrate the other party's performance, it is not understood to interpose new obligations about which the contract is silent, even if inclusion of the obligation is thought to be logical and wise. An implied duty is simply a recognition of conditions inherent in expressed promises." (citations and quotation marks omitted)).

ing first that Tenants could not prove that the damages they claimed were proximately caused by Landlords' breach, and second, that Tenants failed to mitigate their damages, as contract law requires. These theories overlap and both contained a theme that Landlords were acting in good faith. For example, in opening statement, Landlords' counsel said:

The Court determined and was affirmed on appeal that our folks have breached these ground leases having to do with the estoppel certificates and some other things [because] "they made a business decision to breach ground leases." That's not what happened. **They made a business decision not to get [sic] estoppel certificates.** Like most lawsuits, **they thought they were right.** (Emphasis added).

So, from the start of trial, Landlords' counsel portrayed his clients as reasonable businesspersons who had a business reason that they thought was justifiable, to refuse the estoppel certificates. This portrait was offered in the context of attempting to minimize the breach, with counsel saying to the jury: "How did these estoppel certificates, these ungiven estoppel certificates, cause them $50 million, $60 million, what they're going to ask you for, in damages because they went unsigned for about ... seven months[.]" [54] Yet when Tenants asked Landlords what was the basis of their "business decision not to" provide the certificates, the witnesses refused to say, invoking the attorney-client privilege. Since in their argument as to why a certain damage award was too high, Landlords relied on their belief that "they were right" in refusing to issue the certificates, Tenants certainly had a right to inquire as to the basis of that thinking.

As to mitigation, Landlords' counsel threw out this notion:

---

**54.** Landlords' counsel also emphasized that "They have the right to appeal, ... there's nothing wrong with that. And when the Court of Special Appeals ruled, we accept that decision too." Tenants claimed that the period during the appeal of the Circuit Court's injunction against Landlords was crucial to obtaining financing for the project, and the delay caused loss of that financing. Indeed, Jahnke testified that after the breach, NML would have needed to work out a new financing agreement with Tenants, with new terms, equity, and rate.

They're also going to have a duty to mitigate their own damages.... They had things they could have done. Build the buildings. Give [Landlords] the 60 days that they wanted.... [T]here were things they could have done and should have done that would have avoided all of this.

The 60–day notice counsel referred to was a disagreement between the parties as to whether Tenants had failed to comply with the Lease by failing to give Landlords 60 days notice of the site plan amendment for the anticipated project, which Tenants filed with the Commission. During testimony, Landlords' counsel pursued this point by asking Tenants:

Q: Okay. Now, what that meant was that in November of ... 2006 there was only one issue still on the table as to these estoppel certificates that divided your side from their side. Do you remember that?

A. At this point in time, ... that is what I thought.

Q. Okay. And that issue, ... was whether or not [Landlords] were entitled to 60 days[ ] notice of the ... site plan amendment before it was filed. Do you recall that?

A. I recall that.

Q. **Now, [Landlords] said, "We're entitled to 60 days notice," and you said, ... No, you're not." That was the dispute in the fall of '06, was it not?**

A. I think that was the basis on which this letter was written.

Q. Well, was that, is that essentially the dispute on these estoppel certificates?

A. Well, there were things that changed over time, ... and certainly this letter is indicating that this was the only issue outstanding at that time.

Q. **Now, you, you had a solution to the problem. All you had, ... to do is withdraw the site plan amendment and give them the 60 days?**

\* \* \*

Did you inquire as to, "Why don't I just withdraw this, give them the 60 days. They'll get their 60 days and the

problem is solved"? **Did you . . . inquire of anybody if you could do that?**

\* \* \*

**. . . [W]hy you just didn't give them the 60 days and be done with it** was—the reason you didn't is because you weren't required to?

A. That's one of the reasons that I wasn't, . . . and I think the delay . . . would have prejudiced the project if we had to go back through and go through this process again.

Q. **[R]ather than just do that simple thing that maybe would have accounted for 60 days worth of delay, you elected to litigate.**

\* \* \*

**. . . It is that process that you started that brings us here today?** (Emphasis added.)

What this sequence of questions portrays is Landlords' theory that, although legally Landlords were not entitled to 60 days notice, Tenants had a duty to mitigate, and mitigation required that, rather than file a lawsuit to force Landlords to give the estoppel certificate, they just give in to Landlord's demand for 60 days to review the site plan, and re-file the plan with the zoning authority after that review. One could reasonably interpret Landlords' theory to be that Tenants' giving in to the 60–day review (and re-filing) would have avoided the $60 million damage claim because financing would not have been lost and the project could have been built. This theory pre-supposes, of course, that Landlords were not planning other steps to thwart the project, whether by further breach or other method. Tenants' counter to this theory is that Landlords did not want Tenants to complete the development project because they thought they could do better leasing the land to someone else. With these two countervailing theories, Landlords' business reason for refusing the estoppel certificates takes a front and center position as a highly relevant issue in the damages trial. Thus, the trial court acted within its discretion in deciding that Landlords' good faith business

reason for refusing the certificates was a legitimate and relevant area for inquiry by Tenants. There was no error.

## Joint and Several Liability

### *Damages*

The jury found that each Tenant was "entitled to enforce the [other's] ground lease, either as a third-party beneficiary ... or a third-party entitled to the benefit of a covenant running with the land[.]" The Court of Special Appeals overturned this portion of the verdict, holding that there was insufficient evidence of intent to support either theory of joint and several liability. *CR–RSC,* 202 Md.App. at 355–58, 32 A.3d at 484–86. The court also held that only restrictive covenants, as opposed to affirmative covenants such as the agreement to provide estoppel certificates, could be enforced by third parties under a uniform plan of development. *Id.*

Tenants contend that the evidence was sufficient to support joint and several liability under either theory. Landlords respond that the ground leases reflect the parties' intention that each Tenant be "a single-purpose entity formed for the sole purpose of developing its respective parcel." We shall examine the two theories of joint and several liability separately.

 Our task is to review whether the evidence was sufficient to allow a rational fact-finder to impose joint and several liability. *See Taylor v. Giant of Maryland, LLC,* 423 Md. 628, 635, 33 A.3d 445, 449 (2011) (sufficiency of the evidence for a jury verdict is reviewed for whether "a rational fact finder could have found" as the jury did); *see also Univ. of Md. Med. Sys. Corp. v. Gholston,* 203 Md.App. 321, 329, 37 A.3d 1074, 1078 (2012) ("In a civil case, the evidence is legally sufficient to support a finding in support of the prevailing party if, on the facts adduced at trial viewed most favorably to that party, any reasonable fact finder could find the existence of the elements of the cause of action by a preponderance of the evidence.") (citing *Hoffman v. Stamper,* 385 Md. 1, 16, 867 A.2d 276, 285 (2005)).

## Third–Party Beneficiary Status

■ Tenants assert there is ample evidence within the "four corners of the ground leases" to support joint and several liability under the third-party beneficiary theory. Most important, they say, is language in Section 9.3(c) referencing "easements, privileges and obligations" between the two parcels, including "the shared infrastructure of common access, a clubhouse, garage, parking, and recreational areas." [55] Tenants also reference attachments to the ground leases, such as the "site plan for both towers;" "specifications for Towers I and II; plans and specifications for [a] clubhouse shared by both towers; the overall project site plan; and the 'overall underground garage.'" They assert that Section 14.1 makes all of these provisions covenants,[56] and that they became covenants running with the land when Tenants filed "Memoranda of ground lease" with Montgomery County. Thus, Tenants contend that, because the "very purpose" of a covenant running with the land is to "circumvent privity constraints," the four corners of the ground leases show an

---

**55.** Section 9.3(c) of the Tower I ground lease provides:

Simultaneously with the execution of this Lease, Landlord is recording in the Land Records (i) a declaration of easements providing for the use of the Common Areas during the Term by Tenant, the occupants of the Premises, and their respective Permittees, for the maintenance of the Common Areas, and for other related matters (the "Overall Parcel REA") and (ii) a declaration of easements providing for certain rights and obligations as between the Premises and the parcel adjoining the Premises known as future Parcel 21 (the "High Rise REA"). Avalon has joined in the execution of the Overall Parcel REA. Tenant is accepting the Premises under this Lease together with and subject to the rights, easements, privileges, and obligations set forth in the Overall Parcel REA and the High Rise REA.

Section 9.3(c) of the Tower II ground lease is identical, except that it references "future Parcel 20."

**56.** Section 14.1 of each lease provides:

*Construction: Governing Law.* Landlord and Tenant agree that all the provisions hereof are to be construed as *covenants and agreements* as though the words importing such covenants and agreements were used in each separate section hereof. This Lease shall be construed according to and be governed by the laws of the State of Maryland.

intent to confer third-party beneficiary status on each Tenant under our decision in *120 W. Fayette St., LLLP v. Mayor of Balt.*, 426 Md. 14, 35–36, 43 A.3d 355, 368 (2012), and other cases.

Tenants additionally assert that the "surrounding circumstances" are relevant to the parties' intent to create third-party beneficiaries under *Shillman v. Hobstetter*, 249 Md. 678, 689, 241 A.2d 570, 576 (1968), and other authorities. They contend that several "surrounding circumstances" show the parties' intent to confer third-party beneficiary status on each Tenant, including:

> the shared common facilities (underground garage, parking lots, and recreational areas, luxury clubhouse, public access); testimony by . . . Kollevoll that one tower could not be built without the other, in part because neither tower could be financed if approval of the other tower was in dispute; undisputed testimony in support by NML's Nicholas Jahnke;[57] similar testimony by Landlord representative Skip Davis;[58] and provisions in the Tower I ground lease requiring it to be "overbuilt" to serve the Tower II ground lease. (Footnotes added).

Thus, Tenants' assert that, because "the promisee's intent . . . controls,"[59] Tenants' plan to create "intertwined," mutually-dependent towers—under which "[n]either ground lease would have been executed had the other not been executed simultaneously"—"amply supported the jury's conclusion that each RSC tenant was a third party beneficiary of the other's ground lease."

---

57. Here, Tenants likely refer to testimony in which Jahnke said that NML would not have agreed to finance Tower I without the estoppel certificates for Tower II.

58. It is unclear what testimony is referenced here.

59. *See Shillman v. Hobstetter*, 249 Md. 678, 689, 241 A.2d 570, 576 (1968) ("In third party cases, the right of such party does not depend upon the purpose, motive or intent of the promisor . . . [but rather on] the purposes and motives of the promisee . . . to benefit [the third party.]" (quoting 4 *Corbin on Contracts* § 776)).

Landlords cite mostly the same cases as Tenants, arguing that those cases support the Court of Special Appeals' holding. Under those cases, they say, the evidence presented at trial "negates [the] inference" that the parties intended to make each Tenant a beneficiary of the other's ground lease.

 In the primary case cited by both parties, *120 West Fayette Street,* we summarized the law regarding third-party beneficiaries:

> At common law, only a party to a contract could bring suit to enforce the terms of a contract. The common law rule has expanded to permit third-party beneficiaries to bring suit in order to enforce the terms of a contract. An individual is a third-party beneficiary to a contract if the contract was intended for his or her benefit and it clearly appears that the parties intended to recognize him or her as the primary party in interest and as privy to the promise. It is not enough that the contract merely operates to an individual's benefit: An incidental beneficiary acquires by virtue of the promise no right against the promisor or the promisee. (Citations, quotation marks, and alterations omitted.)

426 Md. at 35–36, 43 A.3d at 368.

In *Lovell Land, Inc. v. State Highway Admin.,* we explained the third-party beneficiary standard in more detail. We said the "decisive[ ] distinction" was between "intended and incidental beneficiaries," with the "crucial fact" being whether the pertinent provisions in the contract were "inserted . . . to benefit" the third party. 408 Md. 242, 261, 265, 969 A.2d 284, 296, 298 (2009). Another "factor to consider," we said, is whether the third party is named in the contract or its "antecedent agreements." *Id.* at 265, 969 A.2d at 297–98. We also reaffirmed our agreement with Section 302 of the Restatement (Second) of Contracts, which provides:

> (1) unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is

appropriate to effectuate the intention of the parties and either

> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

> (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

> (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.[60]

*Id.* at 262 n. 6, 969 A.2d at 296 n. 6. Other cases have further detailed this standard. *See, e.g., Noble v. Bruce,* 349 Md. 730, 753, 709 A.2d 1264, 1276 (1998) (holding that the third party was not an intended beneficiary because the promisor "did not communicate or meet with" the third party); *Marlboro Shirt Co. v. Am. Dist. Tel. Co.,* 196 Md. 565, 570, 77 A.2d 776, 778 (1951) ("In order to recover . . . [the third party] must show that [the promisor] owed [him] a duty under the contract.").

▮▮▮ In applying this standard, we look to "the intention of the parties to recognize a person or class as a primary party in interest as expressed in the language of the instrument and consideration of the surrounding circumstances as reflecting upon the parties' intention[.]" *Ferguson v. Cramer,* 349 Md. 760, 767, 709 A.2d 1279, 1283 (1998) (citation and quotation marks omitted).[61]

---

**60.** We further opined that, although the Restatement abandoned the terminology of "donee beneficiaries" and "creditor beneficiaries," the change "was not one of substance, but only of terminology." *Lovell Land, Inc. v. State Highway Admin.,* 408 Md. 242, 263, 969 A.2d 284, 297 (2009).

**61.** This appears to be a deviation from the general rule for interpreting contracts, under which we do not consider "extrinsic evidence" of the parties' intent unless the language of the contract is ambiguous. *See John L. Mattingly Constr. Co. v. Hartford Underwriters Ins. Co.,* 415 Md. 313, 326–27, 999 A.2d 1066, 1074 (2010) ("When the clear language of a contract is unambiguous, the court will give effect to its plain, ordinary, and usual meaning, taking into account the context in which it is used. . . . If the contract is ambiguous, the court must consider any extrinsic evidence which sheds light on the intentions of the parties at

To begin with, only two of the cases cited by Tenants from this Court actually found evidence of intent to create a third-party beneficiary, and they both involved facts markedly different from this case. In *Shillman v. Hobstetter,* a residential developer and a lender agreed that the lender would issue conditional commitments for certain planned homes if the developer would refund certain purchasers' deposits. 249 Md. at 682–83, 241 A.2d at 572–73. The only thing the developer promised to do under the agreement (return the deposits) was clearly intended to benefit the purchasers, so logically we found that the purchasers were intended third-party beneficiaries. *Id.* at 690, 241 A.2d at 576–77. Similarly, in *Prescott v. Coppage,* the trial court appointed a receiver for a savings and loan company as well as a special counsel to assist him. Because the purpose of the court order was to benefit the creditors, we found them to be third-party beneficiaries entitled to recover against the special counsel. 266 Md. 562, 574, 296 A.2d 150, 156 (1972). In both cases, the contracts were created specifically to benefit the third parties in question. In other words, it is fair to say that the purchasers in *Shillman* and the creditors in *Prescott* were the "primary part[ies] in interest" [62] under those contracts, because the provisions that named them were obviously "inserted … to benefit" them.[63]

The same cannot be said of the ground leases in this case, which were clearly entered into first and foremost for the benefit of the parties that signed them. In each ground lease, the purported third-party beneficiary is mentioned only briefly and in passing—to wit, in sections involving easements running between the two parcels, plans for the development of common areas, and overall site plans that mention both towers. The peripheral nature of these provisions—which simply describe the joint nature of the two projects—is substantially

---

the time of the execution of the contract." (citations and quotation marks omitted)).

**62.** *See 120 W. Fayette Street,* 426 Md. at 36, 43 A.3d at 368.

**63.** *See Lovell,* 408 Md. at 265, 969 A.2d at 298.

different from the central provisions in *Shillman* and *Prescott*, which demonstrated how the third parties in those cases were "owed ... a duty under the contract[s]." [64] This, we said, was the "crucial fact" in support of finding a third-party beneficiary, [65] and it is not present here. [66]

---

**64.** *See Marlboro*, 196 Md. at 570, 77 A.2d at 778.

**65.** *See Lovell*, 408 Md. at 265, 969 A.2d at 297–98.

**66.** The two New York cases cited by Tenants are distinguishable for the same reason, as they involve markedly different facts. *See Leawood Bancshares, Inc. v. Alesco Preferred Fundings X, Ltd.*, 823 F.Supp.2d 244, 252–53 (S.D.N.Y.2011) (the "main purpose of the ... Agreement was to permit [the third party] to acquire T & C Bank," and the agreement expressly provided how the third party could use the agreement to its benefit in regulatory proceedings); *Cauff, Lippman & Co., v. Apogee Fin. Group, Inc.*, 807 F.Supp. 1007, 1020 (S.D.N.Y.1992) (holding that a contract that "expressly identifies [the third party] as the broker ... by stating that except for [the third party], no other broker has been employed or is entitled to compensation" made the broker a third-party beneficiary under New York precedents providing that "where a broker is expressly identified in a contract which references an obligation to pay a broker its commission, the broker is entitled to recover as a third-party beneficiary"). The same is true of the one case cited by Tenants in which the Court of Special Appeals found intent to create a third-party beneficiary. *See Dist. Moving & Storage Co. v. Gardiner & Gardiner, Inc.*, 63 Md.App. 96, 101–02, 492 A.2d 319, 322 (1985) (agreement created a contractual duty for the promisee to provide a third-party with a storage warehouse facility).

Tenants also cite many cases in which this Court and the Court of Special Appeals did not find the intent to create a third-party beneficiary. *See, e.g., 120 W. Fayette St.*, 426 Md. at 37, 43 A.3d at 369 (holding that the third party was "at best an incidental beneficiary"); *Dickerson v. Longoria*, 414 Md. 419, 452, 995 A.2d 721, 741 (2010) (third party was not a third-party beneficiary because "there was no arbitration agreement formed to which the Estate could be a third-party beneficiary"); *Lovell*, 408 Md. at 265, 969 A.2d at 297–98 (petitioner did not make the necessary showing to support finding a third-party beneficiary to the contract); *Noble v. Bruce*, 349 Md. 730, 752–53, 709 A.2d 1264, at 1275–76 (1998) (no third-party beneficiary was created); *Ferguson v. Cramer*, 349 Md. 760, 767, 709 A.2d 1279, 1282 (1998) ("[T]he third-party beneficiary exception does not apply in the instant case."); *Hamilton & Spiegel, Inc. v. Bd. of Educ.*, 233 Md. 196, 200, 195 A.2d 710, 712 (1963) (no third-party beneficiary created in the contract); *Marlboro Shirt Co. v. Am. Dist. Tel. Co.*, 196 Md. 565, 571, 77 A.2d 776, 778 (1951) ("There is nothing in the contract whereby the appellant could be identified as a third person beneficiary."); *Mackubin v. Curtiss–Wright Corp.*, 190 Md. 52, 58, 57 A.2d 318, 321 (1948) (plaintiff could

None of Tenants' secondary arguments overcome this "crucial fact." Although covenants running with the land are generally designed to "circumvent privity restraints," the covenant to provide estoppel certificates was not. Nothing about Landlords' breach of that covenant or their breach by pursuing administrative actions had anything to do with the joint nature of the development project. Nor do the "surrounding circumstances" change the "crucial fact" that the breached covenants were not "inserted . . . to benefit" the third party. *See Lovell*, 408 Md. at 261, 265, 969 A.2d at 296, 298. Most of the "surrounding circumstances" alluded to by Tenants simply reveal the joint-nature of the towers project. As we have said, this is not evidence of intent to benefit a third party.

The only novel circumstance is what Tenants' call "the third party's reliance interest" under the ground leases—that each tower would not have been built without the other—which they assert is relevant under the Restatement (Second) of Contracts § 302. Yet simply reviewing the explanation and illustrations of this Restatement section reveals why it is inapplicable here. In each of the section's examples, the contracts were entered into with the express purpose of benefitting a third party, as the parties explained and agreed upon how the third party would be benefitted. *See* Restatement (Second) of Contracts § 302 (1981). Here, in contrast, the parties simply understood that the two towers were to

---

not enforce the agreement because it "was not entered into primarily for [her] benefit. . . . Any right she might have . . . comes to her incidentally as a stockholder"); *College of Notre Dame of Md., Inc. v. Morabito Consultants, Inc.*, 132 Md.App. 158, 179–80, 752 A.2d 265, 276–77 (2000) (declining to decide whether there was a third-party beneficiary under the contracts); *Weems v. Nanticoke Homes, Inc.*, 37 Md.App. 544, 556, 378 A.2d 190, 196–97 (1977) (finding no intent to create a third-party beneficiary). Tenants also cite a case that merely dealt with a motion to dismiss. *See Flaherty v. Weinberg*, 303 Md. 116, 139, 492 A.2d 618, 629–30 (1985) ("Although the Flahertys may find it difficult to support their claim that a direct purpose of the relationship between First Federal and Weinberg was to benefit the Flahertys, they have nevertheless alleged this circumstance as a fact and such allegation is enough to survive the demurrer."). We shall not address the unpublished case cited by Tenants.

"intertwine" as part of a common plan.[67] Tenants cite no other authority to support their reliance theory. We are left, therefore, with no evidence that the parties intended to make each Tenant a third-party beneficiary of the other's ground lease.

### Covenants Running with the Land

■■■ Alternatively, Tenants argue that the Court of Special Appeals erred in holding that there was insufficient evidence to support joint and several liability under the doctrine of uniform plans of development. They also contend that the court incorrectly limited joint and several liability to restrictive covenants, but assert that, in any case, the restrictive covenants present here supported joint and several liability. Landlords respond that the language of the ground leases does not create third-party liability under a uniform plan of development.

To begin with, we know of no authorities, and Tenants provide none, connecting covenants under a uniform plan of development with joint and several liability for damages. As Professor Powell explains, the question of a uniform plan of development arises when a party with an interest in a piece of property in a community asserts that there is an implied covenant that, although not mentioned in any of the community's deeds, restricts what each property owner can do with his or her land. *See* 9 Richard R. Powell, *Powell on Real Property* § 60.03[1] (Michael A. Wolf ed., 2012). In such cases, the implied restriction must be "plain and unmistakable, or necessary" when examining the nature and purpose of the development as a whole. *Id.* (footnote omitted). Such "implied covenants" are "most commonly found in cases involving subdivisions where title to all lots originated in a common grantor." *Id.* § 60.03[2].

---

67. We need not decide whether this provision of the Restatement states the law in Maryland, because it clearly does not apply to this case.

Our cases reflect this description of the "common plan" doctrine. We detailed the history and purpose of the doctrine in *Roper v. Camuso:*

The doctrine of implied negative reciprocal covenants developed in order to provide protection for purchasers buying lots in what they reasonably expected was a general development in which all of the lots would be equally burdened and benefitted.... The seminal prerequisite for asserting that an implied negative reciprocal covenant exists is a common grantor who has a general plan of development for the land. If a general plan of development exists establishing certain restrictions on property use, those restrictions could be enforced in equity.

\*　　\*　　\*

... We stated in *McKenrick v. Savings Bank,* 174 Md. 118, 128, 197 A. 580, 584–85 (1938):

[I]f in such a case it appears that it was the intention of the grantors that the restrictions were part of a uniform general scheme or plan of development and use which should affect the land granted and the land retained alike, they may be enforced in equity; ... the burden is upon one seeking to enforce such restrictions, where they are not specifically expressed in a deed, to show by clear and satisfactory proof that the common grantor intended that they should affect the land retained as a part of a uniform general scheme of development.

In *McKenrick* and subsequent cases, the assertion of an implied reciprocal restriction arising from a general plan of development was not premised on any recorded declaration subjecting the land to restrictions, but was based either on the inclusion by a common grantor of uniform restrictions in individual deeds to specific lots or from oral commitments made to purchasers of lots subject to restrictions that subsequent conveyances of retained land would be subject to the same restrictions. (Citations omitted.)

376 Md. 240, 260–62, 829 A.2d 589, 602 (2003).

As the above examples show, covenants that can be implied by a uniform plan of development must relate to the

uniform plan and "affect the land." *McKenrick*, 174 Md. at 128, 197 A. at 584–85. Such covenants are typically restrictions on how the lots can be used and developed, so as not to alter the nature of the development as a whole. *See, e.g., Roper*, 376 Md. at 259, 829 A.2d at 601 (covenants dealing with the height of fences); *Schovee v. Mikolasko*, 356 Md. 93, 97, 737 A.2d 578, 580 (1999) (restriction providing that "no lot could be devoted to a use other than a residential use and that no lot may contain more than one detached residential structure at any time"); *Turner v. Brocato*, 206 Md. 336, 343–44, 111 A.2d 855, 859 (1955) (covenants "relating to front yard measurements, walls, open spaces, and approval of plans by an architect . . . [and] the maintenance or operation of a number of specified noxious or offensive trades or businesses on the land").

We know of no authority for the proposition that a person with an interest in land subject to the restrictions of a uniform plan can enforce other, unrelated covenants against persons not in privity. The breaches of covenants here—failure to provide estoppel certificates and wrongful administrative actions—have no relation to the common plan. The doctrine simply does not fit the facts. Such evidence cannot create joint and several liability for the breach of unrelated covenants, and we affirm the Court of Special Appeals' decision to reverse the Circuit Court on this issue.

### Attorneys' Fees

Although the Court of Special Appeals invalidated the jury's joint and several damages award, it did not address the trial court's award of joint and several attorneys' fees, observing that the award of attorneys' fees "lies within the sound discretion of the trial judge" and that Landlords had "offer[ed] virtually no argument in support of" overturning that award. *CR–RSC*, 202 Md.App. at 374, 32 A.3d at 495.

Landlords argue that the Court of Special Appeals erred in not extending its ruling on joint and several liability to the attorneys' fees. The only basis for joint and several attorneys' fees, they say, is third-party beneficiary status, which the

court held was not present here. Landlords also assert that it would be "absurd" to ignore Tenants' "carefully crafted separate existences simply because they chose not to act like separate entities in their joint prosecution of this case."

Tenants respond that Landlords incorrectly conflate joint and several liability for attorneys' fees with joint and several liability for damages, which depends on separate analytical factors. They cite cases in which courts have apportioned attorneys' fees among defendants based upon (1) the commonality of issues in the litigation, *Turner v. D.C. Bd. of Elections & Ethics*, 354 F.3d 890, 898 (D.C.Cir.2004); (2) each defendant's degree of liability and culpability, *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 959–60 (1st Cir.1984); and (3) the amount of time spent defending against each defendant, *id.* Thus, Tenants assert that the Circuit Court acted within its discretion in awarding joint and several attorneys' fees.[68]

■ When a contract provides for attorneys' fees in the event of litigation,[69] Maryland Lawyers' Rule of Professional Conduct 1.5 is "the foundation for analysis of what constitutes a reasonable fee." *Monmouth Meadows Homeowners Ass'n v. Hamilton*, 416 Md. 325, 336–37, 7 A.3d 1, 8 (2010). Additionally, the trial court has discretion to consider "any other factor reasonably related to a fair award of attorneys' fees[,]" and the trial court need not "explicitly comment on or make findings with respect to each factor" nor "hold an evidentiary hearing to determine a proper fee award[.]"[70] *Id.* at 337–38 & nn. 11–12, 1 A.3d at 8 & nn. 11–12.

---

**68.** Tenants also assert several waiver arguments, but we shall not address these as we believe the issue is best decided on the merits.

**69.** Here, Section 14.12 of the ground leases provided for attorneys' fees to be awarded:

In the event of any litigation brought by either party to enforce any of the provisions of this Lease, the losing party shall pay the prevailing party's costs and expenses, including reasonable attorneys' fees.

**70.** This is because, "[t]o require such a hearing in every case would excessively interfere with the laudable goal of judicial efficiency."

In this case, the trial court explained on the record why the attorneys' fee estimate of the plaintiffs' expert was reasonable under Rule 1.5. The trial court did not mention the joint and several nature of the award, however, which was summarily stated in the written order. Yet the court did provide a clue as to its reasoning on the joint and several nature of the award. By referring to the parties as "the defendant" and "the plaintiff," the trial court implied that it viewed the parties as single entities for the purposes of attorneys' fees.

Such reasoning is supported by precedent. Although we have not defined precisely when attorneys' fees should be awarded jointly and severally, we have upheld joint and several awards when defendants acted in concert to harm the plaintiffs. *See, e.g., Hoffman,* 385 Md. at 6, 48–49, 867 A.2d at 279, 304–05 (various defendants conspired to defraud and misrepresent aspects of a residential purchase). Federal courts have employed the same reasoning. As the United States Court of Appeals for the D.C. Circuit opined:

> [A] plaintiff's fully compensatory fee for claims centered on a set of common issues against two or more jointly responsible defendants should be assessed jointly and severally. On the other hand, if claims are not attributable to all defendants and are not centered on a set of common issues, i.e., claims that are truly fractionable, fees should be apportioned[.] (Citations and quotation marks omitted.)

*Turner,* 354 F.3d at 898; *see also Action on Smoking & Health v. Civil Aeronautics Bd.,* 724 F.2d 211, 216 (D.C.Cir. 1984).

Indeed, the United States Court of Appeals for the Eighth Circuit has held that "[j]oint and several liability for costs is the general rule unless equity otherwise dictates." *Concord Boat Corp. v. Brunswick Corp.,* 309 F.3d 494, 497 (8th Cir. 2002); *see also Lewis v. Whelan,* 99 F.3d 542, 545 (2d Cir.

---

*Monmouth Meadows Homeowners Ass'n v. Hamilton,* 416 Md. 325, 338 n. 12, 7 A.3d 1, 8 n. 12 (2010) (citation and quotation marks omitted).

1996) (joint and several attorneys' fees appropriate where "the breaches by the parties were mutually dependent and agreed upon"); *Walker v. U.S. Dept. of Hous. & Urban Dev.,* 99 F.3d 761, 773 (5th Cir.1996) (joint and several attorneys' fees appropriate where "there was a single indivisible injury, and each party played a substantial role in the litigation. The parties had a joint legal defense and shared experts."); *Bennett v. Local Union No. 66,* 958 F.2d 1429, 1440–41 (7th Cir.1992) (where the parties participate in each other's breaches, "it is no longer 'unjust' to hold either party accountable for the entire period of injury"); *Allen v. Allied Plant Maint. Co. of Tenn.,* 881 F.2d 291, 298 (6th Cir.1989) (joint and several attorneys' fees appropriate where the employer and the Union "colluded" in the breach).

Landlords cite no authority to contradict these precedents, and we find them instructive here. As in *Hoffman,* Landlords conspired in deciding to breach the ground leases and oppose the development of the towers. 385 Md. at 6, 48–49, 867 A.2d at 279, 304–05. As in *Turner,* Tenants claims "centered on a set of common issues against two or more jointly responsible defendants." 354 F.3d at 898 (citation and quotation marks omitted). As in *Walker,* Landlords "had a joint legal defense and shared experts." 99 F.3d at 773. As in *Bennett* and *Allen,* the parties acted in concert in the breach. 958 F.2d at 1440–41, 881 F.2d at 298. For all of these reasons, we conclude that the joint and several award of attorneys' fees was not an abuse of the trial court's discretion. The Court of Special Appeals' reversal of the joint and several damages award in no way affected the validity of the joint and several attorneys' fees.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID 5/6 BY LANDLORDS AND 1/6 BY TENANTS.**

HARRELL and BATTAGLIA, JJ., dissent.

BATTAGLIA, J., dissenting, in which HARRELL, J., joins.

I respectfully dissent. Although we have been asked to determine, in this economic climate, how lost profit damages

in the context of a speculative real estate venture are to be measured, what the Majority has done is affirm an award of damages as lost profits that is really punitive in nature, rather than acknowledge that any standard for awarding damages lacks certainty and eviscerates foreseeability. I believe, in this framework, that the Landlords [1] should have been afforded their day in court.

In this case, the trial court erred in barring the Landlords from introducing evidence of the depressed residential real estate market as it existed at the time Tenants' claimed lost profits were expected to materialize. As Landlords described at trial, "the world had changed" due to a downturn of the real estate and credit markets caused by the "economic Armageddon in [20]08." The Majority's holding that such drastic economic factors cannot inform an assessment of damages when the nature and extent of such damages were not foreseen by the contracting parties provides a windfall to the non-breaching party by excluding evidence that such profits would not have arisen had the contract been performed. This places the breaching party in the position of a guarantor of the non-breaching party's ultimately unrealistic expectations.

To put the case in context:

Developer Tenants were prevented from building, renting, and selling apartment buildings on Landlords' tracts in Montgomery County. In June of 2004, the parties entered into ground leases under which Tenants would build two high-rise apartment buildings, Tower I, anticipated to be completed in 2008 or 2009, and Tower II, with completion contemplated in 2012. Tenants projected, for their own purposes and as justification for obtaining financing, multimillion dollar profits from the planned development, based on projections made in 2006 of continuing growth in the residential real estate market. In 2007, Landlords breached their contracts, and in 2008, the U.S. housing market crashed. Subsequently, Tenants

---

1. For the purposes of this dissent, I adhere to the Majority's designations of the parties as "Landlords" and "Tenants."

sued for lost profits. Before the case was tried, however, the judge barred Landlords from introducing any "evidence of, or ... arguments based upon, post-breach market conditions for the purpose of refuting [Tenants'] claimed damages," thus precluding introduction of evidence of the real estate market downturn that occurred after the breach but before development of the Towers was to be completed.

The Landlords proffered that they would have offered expert testimony taking into account "the economic downturn and the resulting impact on the real estate market." Landlords' designated damages expert, R. Larry Johnson, according to his proffer, would have opined "that no profits would have been earned by [Tenants], even if there had been no breach, because the Tower I building would have been delivered into a rental market (in 2008 or 2009) which does not support the projections upon which [Tenants' expert's] conclusions are based." Landlords would have introduced expert testimony to rebut Tenants' damage claims, contending that Tenants' projections "are too high, and even slight decreases in market rental rate eliminates the profit in the damages claim." Furthermore, Landlords proffered expert testimony regarding the unrealistic nature of Tenants' projections when viewed in light of "the current market," the "[s]tagnant rental rates in [the real estate] market over the last several years," and evidence of "what the market is/was at the time the Project would have been available for rent."

At trial, Tenants' expert had estimated lost profits based on Tenants' profit projections made in October 2006 for the purposes of obtaining financing for the project.[2] The jury awarded damages in the amount of $36,350,239.00.

In this case, Landlords as well as Tenants had to rely on experts in economics and real estate. To that extent, the parties were evenly matched in their proffered expert testi-

---

**2.** Tenants' expert, Wiley R. Wright, testified that, "[f]or purposes of determining the net gain that would have been realized," the "primary sources of data" were "the stabilized pro forma operating statements and the development budgets that were prepared by [Tenants]" in 2006.

mony, until the trial court barred Landlords' proffered testimony on damages. Obviously neither method for defining lost profits, an inquiry that focuses on foreseeability at time of contracting as the Majority espouses, or market-based calculations from the anticipated time of completion sought by Landlords, can be other than speculative because the buildings in issue were never built. The trial court thus erred in allowing the use of Tenants' assumptions to prove the amount of damages but foreclosing Landlords from rebutting such projections with evidence of the real estate market as it existed at the time the development would have come to fruition.

Clearly, courts prefer a rule that allows admission of evidence of actual performance when such evidence is available. The Majority acknowledges as much when it contends that the cases cited by Landlords all consider the admissibility of evidence of post-breach substitute performance and notes that "none of Landlords' Maryland cases directly support admitting post-breach market evidence to prove lost profits." Op. at 416, 56 A.3d at 187. In *Macke Company v. Pizza of Gaithersburg, Inc.*, we noted that plaintiff's substitute performance after the breach but before trial might be "a more appropriate measure of damages" because it is "grounded on ... actual experience." 259 Md. 479, 492, 270 A.2d 645, 652 (1970). We have further stated that "the actual gain made under the substituted contract must be considered in measuring the damages to which the builder is entitled." *M & R Contractors & Builders, Inc. v. Michael*, 215 Md. 340, 356, 138 A.2d 350, 359 (1958). Thus, it is clear that when evidence of actual performance is available, any rule setting the benchmark for damages determinations either at the time of contracting or at the time of the breach must yield to more relevant evidence of "plaintiff's 'actual experience' with substitute performance." Op. at 414, 56 A.3d at 186, quoting *Macke*, 259 Md. at 493, 270 A.2d at 652.

This principle is supported by Justice Benjamin N. Cardozo's explanation in *Sinclair Refining Company v. Jenkins Petroleum Process Company*, that post-breach evidence of

actual performance must be admitted to avoid providing a financial windfall based on inaccurate prediction:

> The law will make the best appraisal that it can, summoning to its service whatever aids it can command.... At times the only evidence available may be that supplied by testimony of experts as to the state of the art, the character of the improvement, and the probable increase of efficiency or saving of expense.... This will generally be the case if the trial follows quickly after the issue of the patent. But a different situation is presented if years have gone by before the evidence is offered. Experience is then available to correct uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within.

289 U.S. 689, 697–98, 53 S.Ct. 736, 739, 77 L.Ed. 1449, 1456 (1933) (internal citations omitted). Justice Cardozo further determined that "[t]o correct uncertain prophecies in [measuring the damages for a breach of contract] is not to charge the offender with elements of value non-existent at the time of his offense. It is to bring out and expose to light the elements of value that were there from the beginning." *Id.* at 698, 53 S.Ct. at 739, 77 L.Ed. at 1456 (allowing evidence of the actual profits gained from defendant's post-breach use of the plaintiff's device for purposes of proving damages).[3]

The question then becomes, how should lost profits be computed when actual performance is not available as a benchmark. Faced with such a situation, post-contract market evidence has been admitted to prove lost profits. *Hoang*

---

**3.** *See also David Sloane, Inc. v. Stanley G. House & Associates,* 311 Md. 36, 41–42, 532 A.2d 694, 696–97 (1987) (affirming a decision by the trial court to calculate lost profits based on the breaching party's post-breach expenditures); *Fishman v. Estate of Wirtz,* 807 F.2d 520, 552 (7th Cir.1986) (rejecting a "time of the breach" benchmark and upholding a damages calculation that employed actual gains rather than *ex ante* profit predictions); *Advent Systems Limited v. Unisys Corp.,* 925 F.2d 670, 682 (3d Cir.1991) (noting that the court had "serious reservations about the validity of expert testimony based on prior predictions of sales for a given period when actual performance data for that same time span are available").

*v. Hewitt Avenue Associates, LLC* involved the breach of a sales contract for two adjacent parcels of raw land on which town homes were to be built. 177 Md.App. 562, 936 A.2d 915 (2007). In the case, a developer "sought to recover collateral lost profits, *i.e.*, the profits it anticipated it would have realized upon the sale of the 14 town houses it planned to construct on the property, and would have constructed but for [the sellers'] breach by failure to convey." *Id.* at 607, 936 A.2d at 941–42. The sales contract, executed in May 2004, was to close within 60 days. When, in July 2004, the sellers failed to close on the sale, the developer filed suit. Following entry of default against the sellers, the court held an evidentiary hearing on the issue of damages in April 2005. At that hearing, the trial court admitted expert testimony regarding estimated profits on the town homes that were never built. Specifically, the trial court admitted testimony about:

> ... the costs [that the developer] likely would have incurred in developing the land into a community of 14 town houses, the probability of the completed town houses being sold in that area of Montgomery County, the prices the finished town houses would have fetched on the real estate market as it existed at the relevant time, and the profit that would have been returned to [the developer] on the expected sales.

*Id.* at 611, 936 A.2d at 945. The testimony of the expert real estate appraiser, James Donnelly, was based upon his appraisals of the land dependant upon comparable sales and market conditions *at the time of the 2005 hearing.* Additionally, Mr. Donnelly had opined that the profit projections were conservative based on the residential real estate market as it existed at the time of the 2005 hearing. The trial court referenced those "conservative" estimates in finding that "the amount of profits in this case can be determined with reasonable certainty." *Id.* at 574, 936 A.2d at 922. The Court of Special Appeals affirmed the trial court's award of lost profits, concluding that the evidence the of post-contracting real estate market admitted at the hearing was "legally sufficient to prove that [the developer] sustained collateral lost profits due to the breach of contract to convey the property." *Id.* at 610–11, 936 A.2d at

944 (2007). Clearly, when actual performance is absent, evidence of post-contract conditions is admissible and is not rejected as too speculative, unforeseeable and lacking reasonable certainty.

In fact, in the present case, the evidence adduced by Tenants was more speculative than that put forth by the developers in *Hoang,* based as it was on "market conditions as of October, the October 2006 time frame, to determine whether or not the assumptions that were utilized in [Tenants' projections] prepared at that time were reasonable assumptions." Tenants relied on projections of a real estate market three to five years in the future, which turned out, as we know, to be unreliable. As such, it was no more certain than Landlords' proffered testimony as to the state of the real estate market when the Towers would have been built and reached the market.

The Majority contends, however, that post-breach market evidence is not "a necessary part of any consequential lost profits claim." Op. at 417, 56 A.3d at 188. Practical application of the Majority's rule would require that the Landlords here were guarantors of future profits and could not introduce similarly speculative evidence of potential gains and losses to mitigate lost profit damages. The Restatement (Second) of Contracts expressly disclaims such a scenario when it states, "[t]he expectation interest is not based on the injured party's hopes when [it] made the contract but on the actual value that the contract would have had to [it] had it been performed." [4]

---

4. This Court looked to the Restatement provision governing "the measure of damages for breach of contract" in *David Sloane, Inc. v. Stanley G. House & Associates,* in its reasoning:

> The measure of damages for breach of contract is addressed generally in Restatement (Second) Contracts, [Section] 347 (1981) which recognizes that
>> "the injured party has a right to damages based on his expectation interest as measured by
>> (a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus
>> (b) any other loss, including incidental or consequential loss, caused by the breach, less

Restatement (Second) of Contracts Section 344, comment b, at 104 (1981). The Restatement provides an example that is analogous to the situation in this case:

A makes a contract with B under which A is to pay B for drilling an oil well on B's land, adjacent to that of A, for development and exploration purposes. Both A and B believe that the well will be productive and will substantially enhance the value of A's land in an amount that they estimate to be $1,000,000. Before A has paid anything, B breaks the contract by refusing to drill the well. Other exploration then proves that there is no oil in the region. A's expectation interest is zero.

Restatement (Second) of Contracts, Section 344, illustration 5 at 105. Although relied upon by this Court in 1987, this Restatement provision governing lost profits are not ad-dressed by the Majority. *David Sloane, Inc. v. Stanley G. House & Associates,* 311 Md. 36, 42, 532 A.2d 694, 697 (1987).

In determining lost profits when no evidence of actual performance is available, admission of evidence to assist the jury in determining damages that are as close as possible to the actual value of performance is a necessity.[5] By allowing

---

(c) any cost or other loss that he has avoided by not having to perform."

311 Md. 36, 42, 532 A.2d 694, 697 (1987). The "expectation interest" that the *Sloane* Court cited is defined in Section 344(a) of the Restatement (Second) of Contracts as a promisee's "interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed." Section 347(c) of the Restatement contemplates that a factor in damages is loss avoided by saving a party from financial injury. The evidence proffered, but not received, would have shown that the market had deteriorated to the point that the Tenants avoided financial disaster as a result of the Landlords' breach. That evidence should have been allowed under the Restatement as the cost avoided by the Tenants "not having to perform." Restatement (Second) of Contracts, § 344(c).

5. See 11 Corbin on Contracts § 55.3, at 7 (Rev. ed.2005) (stating that the aim of contract damages is to "put the injured party in as good a position as that party would have been in if performance had been rendered as promised"). *See also Knapp v. Eagle Property Management Corp.,* 54 F.3d 1272, 1282 (7th Cir.1995) ("Defendants cannot be forced to put [plaintiff] in a better position than she would have been absent

Tenants to exclude evidence of post-breach market conditions, the Majority effectively puts the Landlords in the position of "A" in the Restatement example, thereby awarding Tenants damages based upon projections that the Landlords were not permitted to rebut.[6]

By embracing the jury verdict that was not informed by the Landlords' expert testimony, the Majority reinforces an award that is punitive in nature. It is clear from the evidence presented at trial that the apparently willful and acrimonious breach on the part of the Landlords colored the jury's damage award. The trial court admitted an email from Landlords to their former counsel requesting that counsel "stop the bastards," and in denying Landlords' pre-trial motion in limine to exclude this communication, the trial court reasoned,

> I think a jury has a right to know how everything was formed, and what happened. . . . I also think [the discovery] goes to credibility. If they think that one side is basically trying to undermine the other side, a jury can evaluate their credibility by examining that.
>
> And, also motive and intent, I think are relevant in this case. . . . [I]f you had no defense, other than, yes, we breached it, we screwed the deal royally, we're the bad guys, and let's basically only talk dollars and cents, then I probably would take a different position. . . ."

---

their conduct."); *Dopp v. Pritzker,* 38 F.3d 1239, 1248 (1st Cir.1994) (holding that the trial court's instructions that "full damages . . . reflect the amount necessary to put Dopp in as good a position as he would have been if the oral contract had been fully performed" amounted to "virtually a hornbook restatement and application of the concept of contractual wholeness.").

6. By setting the threshold after which market evidence may not be considered at the time of contracting, the Majority moves the bar further back in time, from the 2006 "time of the breach" inquiry that Tenants request and that the trial court and the Court of Special Appeals used, to 2004, when the ground leases were executed. *CR–RSC Tower I, LLC v. RSC Tower I, LLC,* 202 Md.App. 307, 337, 344, 32 A.3d 456, 473, 478 (2011). The Majority's rule effectively requires evidence that is more speculative and uncertain than even the 2006 projections, misguided in themselves.

The Majority references the "bastards" e-mail, suggesting it may have been the "smoking gun" in the case, op. at 402–03, 56 A.3d at 179, highlighting the spectre that the damages awarded are really punitive in nature because, what would it be a "smoking gun" of, other than willfulness? Certainly we should not be sanctioning punitives in the guise of "lost profits." The Landlords should have had their day in court; I respectfully dissent.

Judge HARRELL has authorized me to state that he joins this dissenting opinion.